J-S63001-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN WILLIAMS | : | |
| | : | |
| Appellant | : | No. 20 WDA 2017 |

Appeal from the Judgment of Sentence October 17, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0015124-2015

BEFORE:   OTT, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY OTT, J.:                          FILED JULY 2, 2019

John Williams appeals from the judgment of sentence imposed October 17, 2016, in the Allegheny County Court of Common Pleas, made final by the denial of post-sentence motions on December 1, 2016.  On July 18, 2016, a jury convicted Williams of two counts of first-degree murder, two counts of robbery, and one count of carrying a firearm without a license.[1]  The court subsequently sentenced Williams to an aggregate term of life imprisonment. On appeal, Williams challenges the sufficiency of the evidence supporting his convictions.  For the reasons below, we affirm the judgment of sentence.

The trial court set forth the facts and procedural history as follows:

_____

* Former Justice specially assigned to the Superior Court.

[1]  See 18 Pa.C.S. § 2502(a), 3701(a)(1)(i), and 6106(a)(1), respectively.

David McCarthy testified that on September 11, 2015, he was getting gas at an Exxon Station located at Marshall Avenue and Brighton Road, around 3:00 p.m., Pittsburgh[,] Pennsylvania.

He observed a Chevy Silveredo stop, the door open, and the vehicle proceed into the cross walk.

Mr. McCarthy heard three pops believing them to be gunshots and saw someone jump out of the back door, put a hood up and run from the area.

The driver fell out of the truck and appeared to be dead and a passenger was slumping inside the truck inside the seat belt.

A crossing guard in the area appeared to call 9-1-1.

City of Pittsburgh [P]olice [O]fficer Stanley Comans was on duty and responded to the scene after being flagged down by a passer-by.

He observed a white male who appeared to be deceased in the passenger seat of the pick-up truck and another white male deceased, laying on the street on the driver's side.

The passenger was actually alive and CPR was performed o[n] him by Sgt. Gault and he was the taken from the scene by ambulance.

Markus Watson testified that on September 11, 2015 he lived at 1306 Gifford Street and sold drugs for a living. He testified that he made arrangements to sell heroin to a person named Ken [Beckel] that day.

Arrangements were made for Ken and another person, Jamie [Romesburg], to come to buy $275 worth of heroin. The Defendant, John Williams, was also at the house that day around 3:00 [p.m.]. His nickname was Butters, and he was a friend of Mr. Watson's cousin, April Fountain, who lived at 1306 Gifford Street. Mr. Watson observed Ken's silver truck parked across the street, and he saw someone get in the truck with a dark hoodie and green pants. This clothing was similar to that which was worn by the defendant, Mr. Williams.

- 2 -

Officer Comans testified, using Commonwealth Exhibit 2, that 1306 Gifford Street was essentially across from the intersection of Marshall and Bright. Mr. Watson received a text message that Mr. Ken Beckel had arrived in the truck. Watson also testified that [Williams] had left the house about 10-15 minutes before Ken arrived at the location near the house.

Watson then observed a person on the side of the truck and he called and texted Ken not to let the person inside as the truck pulled away [because Watson did not know who this person was but he did testify that the clothing worn by the individual was similar to what Williams wore on that day].

Five to ten minutes later [Williams] came back to its [sic] house, frantic, according to Watson. [Williams] immediately ran upstairs and told Watson "I shot someone in the head." [Williams] later came downstairs after having changed his clothes.

Mr. Watson then called for a ride and left the house with Ms. Fountain's t[wo] children, taking them to their mother. [Williams] was identified by Mr. Watson on November 6, 2015, when he identified [his] photograph, Exhibit 3 as the man known as "Butters" and he also related to police what had occurred at the house that day.

Detective Ron Freeman of the Pittsburgh Police Mobile Crimes Unit testified at length about processing the scene of the shooting. He reviewed photographs that were taken along with other evidence gathered, including numerous shell casings from a .380 caliber firearm. The detective noted that no fingerprints of value were recovered from inside the trunk.

Detective Anthony Beatty testified that he recovered $275 cash from the body of decedent, James Romesburg, at the crime scene. He then identified the clothing that was recovered from the deceased, Mr. Romesburg, which had numerous strains [sic] and holes.

April Fountain testified that [Williams] lived at the Gifford Street address with her at the time of the shooting, that he provided childcare for her and that he was known to possess and carry a firearm.

Norbert Graf, a postal worker was behind the victim's vehicle at the time of the shooting. He heard someone yell "get out," observed three individuals in the truck, and did not observe any struggle inside the vehicle. Shortly afterwards, the vehicle's driver put his hands in the air, and the driver reached to open the door. The individual in the back seat reached forward, shot the driver first and then the passenger. Mr. Graf testified he saw nothing in the driver's hands.

Detective Joseph Fabus testified that [Williams] was taken into custody and interviewed. [Williams] waived his Miranda[2] rights and talked with police. [Williams] stated that he wondered how much time someone would get for self-defense. The detective responded that each case is different. [Williams] initially denied any involvement, and denied even being in the neighborhood. [Williams] denied being on Gifford Street at the time of the shooting. [Williams] kept asking how much trouble could he get in for self-defense. [He] then related a version of events where he entered the pick-up that day, got into an argument with Mr. Romesburg, who allegedly pulled a gun, a struggle ensued, and [Williams] started shooting inside the pick-up in self-defense. [Williams] then disposed of the firearm by giving it to a man named "Jim" who was Spanish and was in the East Liberty section of Pittsburgh.

Finally, Dr. Jessica Dwyer testified as an expert forensic pathologist, and after conducting autopsies on Mr. Bec[k]el and Mr. Romesb[u]rg concluded that both died from gunshot wounds and that the manner of death was homicide.

Trial Court Opinion, 1/19/2018, at 3-6 (record citations and footnotes omitted).

Williams was charged with multiple offenses related to the double murder. He filed a motion to suppress, which was denied on July 11, 2016. The matter proceeded to a jury trial on July 13, 2016. On July 18, 2016, the

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

jury convicted Williams of two counts of first-degree murder, two counts of robbery, and one count of carrying a firearm without a license. Sentencing was deferred in preparation of a presentence report. Counsel for Williams filed a motion to withdraw as counsel, which was granted on September 29, 2016. New counsel was then appointed.

On October 17, 2016, the court sentenced Williams to the following: (1) consecutive terms of life imprisonment for both counts of first-degree murder; (2) consecutive terms of eight to 20 years' incarceration for both counts of robbery; and (3) a consecutive term of three to seven years' incarceration for the firearm offense. Williams filed post-sentence motions, which were denied on December 1, 2016. This timely appeal followed.[3]

Because all three of Williams' claims involve sufficiency of the evidence, we will begin with the well-settled standard of review:

> Evidence legally is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to enable a reasonable fact-finder to find all of the elements of first-degree murder beyond a reasonable doubt. In conducting this inquiry, we must evaluate the entire trial record. In addition, "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence."

_____

[3] On January 31, 2017, the trial court ordered Williams to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Following the grant of a motion for extension of time, Williams filed a concise statement on January 5, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on January 19, 2018.

Commonwealth v. Clemons, 200 A.3d 441, 462 (Pa. 2019) (internal citations omitted).

In his first argument, Williams claims there was insufficient evidence to sustain his two convictions for first-degree murder because the Commonwealth failed to prove that he did not act in self-defense. See Williams' Brief at 16. First, Williams points to the following trial testimony as evidence that he acted in self-defense: (1) Williams needed a ride to visit his mother and he tricked the victims, pretending to work with Watson to sell them drugs, and got into the rear seat of the truck; (2) the victims became angry when they realized Williams did not have any drugs on him; (3) the driver, Jaime, pointed a gun at Williams, there was a scuffle, and the gun went off, killing Ken in the passenger seat; and (4) Jaime then lunged for Williams and based on the belief that Jaime would kill him, Williams got control of the weapon and pulled the trigger. Id. at 20-22. Williams noted he appeared frightened and scared to other individuals following the shooting. Id. at 22.

Furthermore, Williams contends the following eyewitness testimony did not disprove his self-defense claim: (1) David McCarthy testified he saw the doors to the truck open and close and he heard three shots; (2) John Graziano stated he saw the truck and noticed the driver was reaching for something before the shooting; (3) Norbert Graf gave an initial statement that he did not see who fired the weapon but subsequently, at trial, he testified he observed Williams shoot the driver, but he did not provide evidence countering Williams'

defense of justification; and (4) the ballistics evidence of a downward trajectory does not support Mary Young's testimony that Ken was sitting up in his seat when he was shot because Ken is ten inches taller than Williams and it does not "follow that any bullet fired by Mr. Williams at the front seat passenger would have a downward trajectory." Id. at 23-24. Rather, Williams argues this evidence supports his story that Jaime "shot the weapon while they were grappling for it, and this was the shot that killed his friend Ken." Id. at 24.

Lastly, Williams alleges the Commonwealth did not defeat his justification defense because: (1) Williams reasonably believed it was necessary to kill the victims in order to protect himself from imminent death or great bodily harm where Jaime brought a gun with him to buy heroin, there was a scuffle, and Jaime recklessly shot Ken in the passenger seat; (2) Williams was free from fault in provoking or continuing the difficulty because he did not have a gun, Jaime and Ken were angry that Williams had entered the truck without the drugs, and he was stuck in the back seat because of the way the doors were configured; and (3) Williams did not violate any duty to retreat from the altercation since that was not an option because he was prevented from retreating due to being trapped in the back of the truck. Id. at 24-26.

In order to convict a defendant of first-degree murder, the Commonwealth must prove "a human being was unlawfully killed; the

- 7 -

defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill." Commonwealth v. Houser, 18 A.3d 1128, 1133 (Pa. 2011), cert. denied, 526 U.S. 1247 (2012). See also 18 Pa.C.S. § 2502(a). The Commonwealth may satisfy its burden of proof by circumstantial evidence. See Houser, supra, 18 A.3d at 1133. Moreover, the fact finder may infer the defendant acted with both malice and a specific intent to kill when he uses a deadly weapon on a vital part of the victim's body. See id. at 1133-1134 (quotation omitted). Additionally, "our Supreme Court has repeatedly held[ that] a jury may properly infer malice and specific intent from the fact that a victim was shot multiple times." Commonwealth v. Kennedy, 151 A.3d 1117, 1122 (Pa. Super. 2016).

A claim of self-defense or justification requires the following three elements:

> "(a) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the defendant did not violate any duty to retreat." Commonwealth v. Samuel, 527 Pa. 298, 590 A.2d 1245, 1247-48 (1991). See also Commonwealth v. Harris, 550 Pa. 92, 703 A.2d 441, 449 (1997); 18 Pa.C.S. § 505. Although the defendant has no burden to prove self-defense, . . . before the defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." Commonwealth v. Black, 474 Pa. 47, 376 A.2d 627, 630 (1977). The Commonwealth sustains that burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the

slaying; that the slayer did not reasonably believe that he was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save himself therefrom; or that the slayer violated a duty to retreat or avoid the danger." Commonwealth v. Burns, 490 Pa. 352, 416 A.2d 506, 507 (1980).

Commonwealth v. Mouzon, 53 A.3d 738, 740-741 (Pa. 2012). "'Although the Commonwealth is required to disprove a claim of self-defense … a jury is not required to believe the testimony of the defendant who raises the claim.'" Houser, 18 A.3d at 1135, quoting Commonwealth v. Carbone, 574 A.2d 584, 589 (Pa. 1990).

The Pennsylvania Crimes Code governs self-defense and provides, in pertinent part, as follows:

§ 505. Use of force in self-protection

(a) Use of force justifiable for protection of the person.— The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

(b) Limitations on justifying necessity for use of force.—

…

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

- 9 -

> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating[.]

18 Pa.C.S. § 505(a)-(b).

A review of the trial testimony reveals the following: Watson testified that on the day of the shooting, he intended to sell Beckel a "brick" of heroin. N.T., 7/13/2016 – 7/15/2016, at 77-78. Watson indicated Williams was in the room as he was texting and speaking with Beckel. Id. at 78-80, 98-99. He stated Williams left 15 minutes before Beckel was to arrive. Id. at 85. Watson then noticed someone get into Beckel's truck, wearing similar clothing to what Williams was wearing on that day. Id. at 87-89. Watson tried to text Beckel and tell him not to let that person in the vehicle. Id. at 92. Watson stated that Williams returned to the house five to 10 minutes later, he appeared frantic, and said he "shot someone in the head." Id. at 93. Watson said Williams then went upstairs and changed clothes. Id.[4]

Fountain took the stand and stated that Williams returned to the house two days after the shooting and he told her he shot the two men because "he was scared to go back to jail." Id. at 220. Fountain said Williams told her Watson "was supposed to meet with somebody, … they owed him money, so he sent [Williams] out to go rob them[.]" Id. at 221. Fountain indicated

_____

[4] On cross-examination, Watson testified that Williams also looked scared and frightened. Id. at 99.

Williams showed her the gun he used during the incident and said he wanted to sell it. Id. at 223.[5] She also stated Williams was known to carry that gun often. Id.

John Graziano testified that on the day in question, he was on the road near the victims' truck when he saw the driver's side door open, the driver, Romesburg, attempting to get out of truck but he was shot twice. Id. at 240-241. He then observed someone on the passenger-side get out of the truck and run down a side street. Id. at 242. He did not hear any talking or yelling coming from the truck. Id. On cross-examination, Graziano testified that before he saw the driver start to get out of the vehicle, the driver appeared to be gesturing with his hands "like he was talking" and he looked like he was grabbing something because "his body was over' but then "he sat back up." Id. at 251. He did not see the driver turn toward the backseat, and he could not see anyone else in the truck because of where the truck was located in relation to his vehicle. Id. at 253.

Norbert Graf testified that he was two vehicles behind the victims' truck on the day of the shooting. Id. at 255. He stated the truck was sitting in the intersection when he saw the driver's arms go up, heard someone yell "get out," and then observed the driver reached to open the door, and the person

_____

[5] On cross-examination, Fountain was uncertain if she initially told police that Williams was committing a robbery for Watson. Id. at 232.

in the backseat reached forward, shot the driver first, and then the passenger. Id. at 259. Prior to the shooting, Graf could not see any kind of scuffle going on in the truck, and no one was touching another individual. Id. at 258-259.[6]

Mary Young testified that she was a crossing guard at the intersection where the shooting took place. Id. at 474-475. She observed the passenger open the door and that he "just sat there and looked straight ahead and did not move until at one point he tried with his right arm -- there was a back door that opens opposite, and he was trying to reach for the handle to do that." Id. at 477. Young stated the passenger just moved his right hand, "never turned his head, never turned his body in any way." Id. at 478. She then heard someone say, "he has a gun," and then shots were fired. Id. at 479.

Detective Joseph Fabus testified that he arrested Wiliams and placed him into custody. Id. at 300. Detective Fabus stated Williams was coherent, concise, clear, and did not appear to be showing any problematic signs. Id. at 303. The detective stated, "Early in the interview Mr. Williams had stated the question that he wondered how long someone could get for self-defense." Id. at 304. Detective Fabus then described Williams' statement to police as follows:

---

[6] On cross-examination, Graf indicated he never told police that he saw someone in backseat firing the gun. Id. at 268-270. He originally thought the shooter was in another car that passed the truck on the road. Id.

Started off, I was never on the North Side. I don't know Ms. Fountain. I don't know her address. Again, he kept coming back to the question, how much trouble he could get in for self-defense. It seemed like any time we would show him more evidence where we would contradict him, obviously he was at the residence, obviously he knew Ms. Fountain, obviously he knew Mr. Watson, every time that would happen it told him -- he would come along a little bit in the story.

He would always come back, three or four times early on, to how much trouble he could get in for that.

...

He said that eventually he did know Ms. Fountain, that he was staying at her home for sometime. She was from the Homewood area of the city. He said that she picked him up, I believe it was downtown Pittsburgh, around 11:00 o'clock in the morning. He went back to her residence, slept in her bed until about 3:00 in the afternoon.

He was awoken by Mr. Watson, who informed him that there was a narcotics transaction going to take place at the residence, and he said that Mr. Watson asked him to conduct the transaction, and Mr. Williams said he did not want to.

He wanted to go to his home in I believe East Liberty or Homewood to see his mother, but he didn't have enough money to get a bus or any kind of means to get there.

So the topic came to Mr. Watson telling him, why don't you do the drug delivery. You keep the money, then you can see that -- use that money to go see your mother.

Mr. Williams said he didn't want to do that. Let me just finesse. He explained what he meant by that. He was going to get into the car with the victims, tell them that he didn't have any narcotics on him at the moment, and he needed a ride to what would have been his mother's neighborhood and then tell them, I have to go get the drugs.

When he got out of the truck he would just not get back in. He told us he intended to beat them for a free ride to [East End, Homewood area].

...

He said he went outside. He entered the vehicle parked across the street a couple houses down to the right from 1306 Gifford.

He entered through the passenger side of the vehicle. The vehicle began driving, made a series of turns, and Mr. Romesburg was the driver, identified that through the picture. Mr. Beckel was the front seat passenger.

He said that Mr. Romesburg had asked him what kind of bags they were. So narcotics and heroin use in the City of Pittsburgh, it is most prevalent. You would see white glassine stamp bags. They are very small. They are about the size of maybe your knuckle to your thumb.

They have a stamp on them. It is kind of a programming. Since narcotics users will prefer certain stamps over the other, when he asks what kind of bags they are, he is referring to what is the stamp on the bags.

Mr. Williams stated that he didn't have them on him and that he was going to have to get them. At the end, he would take them to where they were. He would take them and give them to them.

Mr. Williams enraged Mr. Romesburg, who got very argumentative with him, told him that's not right. He should have them on him. At that point, they engaged in an argument in the car.

He said Mr. Beckel was not aggressive at all at that time. He said they came to a -- came close to an intersection. Mr. Romesburg produced a small black shiny pistol with his right hand. The way he described was that he was trying to turn around toward Mr. Williams who had said he positioned himself from the time he got in the truck in the center of the back seat.

The truck is a silver truck. It has the rear like side door, where it has to be -- the passenger front door has to be open to let him out of the back.

- 14 -

He placed himself in the backseat in a triangle between the driver, passenger and himself. At that point, he said Mr. Romesburg was turning as if he was trying to turn around with the pistol but didn't get all the way around in his seat. He didn't rotate all the way around.

At that point, he said he reached out with his left hand, grabbed the wrist of Mr. Romesburg and a struggle ensued for the firearm.

As it was going on, Mr. Romesburg's foot came off the brake. The truck proceeded to keep moving forward. He said Mr. Beckel reached over and put the vehicle in park.

At that point, the struggle ensued for the pistol. The firearm went off shooting Mr. Beckel. He said at that point he, Mr. Williams, was able to take control of the firearm and sit back in his rear seat.

He said Mr. Romesburg turned aggressive, came at him. He was in fear Mr. Romesburg would take the pistol off of him, so he said he just closed his eyes and just kept shooting.

...

He said he got out of the vehicle, and he fled back directly toward 1306 Gifford staying, I believe he said, on the left side of the street. He stayed on one side of the street the whole way back.

He got back to the residence. He told Mr. Watson what just happened. He told him that he shot them. He was in a small bit of a panic.

Mr. Watson became in a panic and collected Ms. Fountain's children, then took them to her downtown leaving Mr. Williams at the residence.

...

He said he took [the firearm] to -- I believe it was two weeks later, I'm not sure. He went to an area in East Liberty where he knew an individual named Jim.

Jim, he depicted, as a Spanish male. He stood on the corner, would trade firearms for money or whatnot. He took this firearm to this man Jim, gave him the firearm, told him he didn't want any money from him.

Jim laughed at him. He held on to it, didn't take any money. He just knew he should be rid of – he knew he shouldn't have been in possession of it.

Id. at 322-329.

Detective Anthony Beatty testified a $20 bill was found in Romesburg's left hand and $255.00 under his right hip. Id. at 148-149. Jessica Dwyer, M.D., testified the passenger, Beckel, died as a result of a penetrating gunshot wound to the left side of the head that had a trajectory of rightward, forward, and downward movement. Id. at 409-424. Dr. Dwyer stated the driver's, Romesburg's, cause of death was multiple penetrating gunshot wounds to the right side of his trunk. Id. at 435-452. The bullets also perforated, among other things, the areas around Romesburg's lungs and heart. Id.[7]

Initially, we note that while Williams presents this as a sufficiency claim, a substantial part of his argument is primarily challenging the weight of the evidence, insofar as he is asking this Court to reweigh the evidence, particularly his statement to police and eyewitness testimony, presented at trial in his favor. We decline to do so. See Commonwealth v. Olsen, 82 A.3d 1041, 1049 (Pa. Super. 2013) ("The fact-finder is free to believe all, part,

_____

[7] Beckel was shot in the back of his head while Romesburg was shot three times, twice in the back and once in the hip.

- 16 -

or none of the evidence; an appellate court will not make its own assessment of the credibility of the evidence.").

Second, Williams largely relies on the statement he gave to police explaining his version of how the shootings transpired to support his argument that he acted in self-defense. Williams' self-serving statement was essentially the only evidence supporting his defense. The jury, sitting as a fact-finder, was free to accept or reject his evidence. See Clemons, 200 A.3d at 462; see also Houser, supra. In finding him guilty of first-degree murder and related crimes, the jury clearly did not believe his alternative theory. Moreover, we are not permitted to substitute the fact-finder's judgment with our own. See Clemons, 200 A.3d 441, 462.

Third, the testimony at trial established Williams was responsible for killing Beckel and Romesburg. His use of the gun, a deadly weapon, on vital parts of the victims' bodies – Beckel being shot in the head, Romesburg being shot multiple times in the trunk area – allowed the jury to infer specific intent required for a finding of first-degree murder. See Houser, supra; Kennedy, supra.

Furthermore, viewing the facts in the light most favorable to the Commonwealth as the verdict winner, we find the Commonwealth disproved Williams's claim of self-defense beyond a reasonable doubt. First, Williams is not free from fault in provoking the situation. Williams entered the victims' truck with the intent to either: (1) rob them, according to Watson's and

Fountain's testimony; or (2) trick them into giving him a ride, according to his statement to police.

Second, based on the evidence presented, one can infer Williams did not reasonably believe he was in imminent danger of death or serious bodily injury. Several witnesses testified that they did not see any movement in the truck demonstrating an on-going scuffle between the men: (1) Graziano stated he did not see Romesburg turn in the direction of the backseat but Romesburg was in the process of opening his door when he was shot twice; (2) Graf observed Romesburg's arms go up at one point with nothing in his hands but then saw Williams reach forward, shoot Romesburg, and then Beckel; and (3) Young testified she saw Beckel sitting straight up, and he did not move his body except to open the door. Additionally, Fountain indicated Williams showed her the gun he used during the incident and he was known to carry that gun often. There was no evidence of another firearm present at the scene. This circumstantial evidence contradicts Williams' defense argument that Romesburg brought a gun with him to buy drugs, pointed it at Williams, there was a scuffle, the gun went off, killing Beckel in the passenger seat, and then Romesburg lunged for Williams and based on the belief that [Romesburg] would kill him, Williams got control of the weapon and pulled the trigger. As such, there was no evidence demonstrating Williams believed he was in imminent danger of death or serious bodily injury, and that it was

necessary for him to use deadly force against the victims, which the jury was free to disbelieve. Accordingly, Williams' first claim fails.[8]

Next, Williams contends that in the alternative, there was insufficient evidence to support the first-degree murder conviction where the evidence, at most, showed he was guilty of "imperfect self-defense" voluntary manslaughter. See Williams' Brief at 27. Williams states:

> Even though [he] did not take the stand, the jury could have reasonably inferred from his initial statement to police, as well as the testimony of Markus Watson, who saw Williams immediately after the incident, that Williams acted out of fear that his life was in danger. Even if the jury concluded that this fear was unreasonable, it motivated Mr. Williams and is evidence of his subjective state of mind.

Id. at 28-29. Moreover, Williams asserts:

> [He] could not have retreated with safety, as he was trapped in the back seat of the truck until the main front door to the truck opened; he violated no duty to retreat. [He] also did not provoke the shooting; the gun was brought into play by the driver of the truck, [Romesburg]. While Mr. Williams did enter the truck in an attempt to "finesse" a ride from the two drug users, he did not do so violently. Even the eyewitness accounts show that the driver, [Romesburg], fumbled and retrieved the gun. No provocation of violence occurred by Williams when he attempted to grab the gun from [Romesburg]; it was, instead, [Romesburg] who provoked the difficulty which culminated in the slaying. Thus, the two other elements of the justification defense were satisfactorily proven; the only remaining element is whether Mr. Williams's belief that he was in imminent danger of death or serious bodily injury, and that deadly force was necessary to prevent his own death, was reasonable. If the belief was reasonable, as in the first issue of this Brief for [Williams], then no conviction should have been

_____

[8] Because the Commonwealth is only required to negate of one of the three elements of self-defense, we need not address the remaining prong regarding a duty to retreat. Burns, 416 A.2d at 507.

obtained. If this Court determines that the belief was unreasonable, but that the other elements of the justification defense were proven, the appropriate conviction would be for voluntary manslaughter, not first-degree homicide.

Id. at 29-30.

Keeping our standard of review regarding sufficiency of the evidence in mind, we are guided by the following. Pursuant to 18 Pa.C.S. § 2503(b), "an intentional killing is voluntary manslaughter if committed as a result of an unreasonable belief in the need for deadly force in self-defense." Commonwealth v. Washington, 692 A.2d 1024, 1029 (Pa. 1997), cert. denied, 523 U.S. 1006 (1998).

> In explaining what elements are necessary to establish unreasonable belief voluntary manslaughter, which is sometimes referred to as "imperfect self-defense," [the Supreme Court has] stated:
>
>> This self-defense claim is imperfect in only one respect-an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [still be met in order to establish] unreasonable belief voluntary manslaughter.
>
> Commonwealth v. Tilley, 528 Pa. 125, 595 A.2d 575, 582 (1991). In order to establish the defense of self-defense under 18 Pa.C.S. § 505, the defendant must not only show that he was protecting himself against the use of unlawful force but must also show that he was free from fault in provoking or continuing the difficulty which resulted in the killing. See 18 Pa.C.S. § 505; Tilley, 595 A.2d at 581.

Commonwealth v. Bracey, 795 A.2d 935, 947 (Pa. 2001) (footnote omitted). Furthermore, we note that "[i]f a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-

- 20 -

defense claim beyond a reasonable doubt." Houser, 18 A.3d at 1135. Nevertheless, "a jury is not required to believe the testimony of the defendant who raises the claim." Id., quoting Carbone, 574 A.2d at 589.

Williams is again asking this Court to re-weigh the evidence and give full consideration to his statement to police. We decline to do so. While the jury could have reasonably inferred from his statement and Watson's testimony that he acted out of fear that his life was in danger and that this fear was reasonable, as he suggests, the jury did not do so. Rather, in convicting him, the jury rejected such a belief. Again, we are bound by the jury's credibility determinations. As determined above, the Commonwealth disproved William's defense that he was protecting himself against the use of unlawful force and that he was free from fault in provoking the difficulty which resulted in the killings. See Houser, supra. Accordingly, Williams' second sufficiency argument fails.

Lastly, Williams contends his robbery conviction was not supported by sufficient evidence. See Williams' Brief at 32. Specifically, he states:

> [T]here is no evidence of a theft or an attempt to commit a theft. Notably, the driver, [Romesburg], was found on the street with his drug money laying by his side; Mr. Williams left $ 275 on the side of the road. Nothing was missing from the truck or the victims inside the truck.
>
> Moreover, Mr. Williams admitted to trying to "finesse" a ride from [Beckel] and [Romesburg], but this would not be considered a "theft" for our purposes. If [Beckel] and/or [Romesburg] had been part of a taxi service, or Uber drivers or the like, i.e., someone who was paid to give people rides, then Mr. Williams may have had the idea to steal their professional services by

obtaining a ride to his mother's home and then leaving without paying for it. But [Beckel] and [Romesburg] were not professional drivers. There was no theft or attempted theft of services here. Nor is there any property of either [Beckel] or [Romesburg] found with Mr. Williams. The loose money, which is something usually taken during a robbery, was left in the street. There was no taking, no attempt at taking anything, nor any flight from taking something from the truck. Without a theft of some sort, there can be no robbery.

Id. at 33-34.

The jury found Williams guilty of two counts of robbery pursuant to Subsection 3701(a)(1)(i), which provides, in pertinent part: "A person is guilty of robbery if, in the course of committing a theft, he … inflicts serious bodily injury upon another[.]" 18 Pa.C.S. § 3701(a)(1)(i). "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S. § 3701(a)(2). "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a).

Here, the trial testimony established that Williams intended to rob Romesburg and Beckel of $275.00, which was to be used for a drug transaction. He went into the truck and shot both men. Williams admitted this fact to Fountain two days after the shooting. It is no consequence that he was unsuccessful at obtaining the money prior to fleeing the scene. See Commonwealth v. Leatherbury, 473 A.2d 1040, 1042 (Pa. Super. 1984) (stating "[n]either the fact that [the appellants] did not inflict bodily injury nor

that they were unsuccessful in obtaining the victim's money was controlling.").

Therefore, we conclude there was sufficient evidence to support Williams' convictions for robbery. Accordingly, his final argument also fails.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/2/2019