574 A.2d 584

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Patricia Ann CARBONE, Appellee.**

Supreme Court of Pennsylvania.

Argued March 5, 1990.

Decided May 10, 1990.

As Amended Aug. 15, 1990.

552

David J. Flower, Dist. Atty., James M. Jacobs, Jr., Somerset, for appellant.

Marianne E. Cox, Asst. Dist. Atty. for Philadelphia Dist. Atty., Philadelphia, for amicus curiae.

Kevin Rozich, Johnstown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On April 5, 1985, a jury found appellee, Patricia Ann Carbone, guilty of murder of the first degree for the killing of Jerome Lint. The Court of Common Pleas of Somerset County denied appellee's post-verdict motions and sentenced her to a term of life imprisonment. On appeal by appellee, a divided en banc panel of the Superior Court reversed the judgment of sentence and remanded for a new trial on the charge of voluntary manslaughter. We granted the Commonwealth's petition for allowance of appeal, and we now reverse.

On her appeal to Superior Court, appellee challenged her conviction on the basis of the sufficiency of the evidence, claiming that the Commonwealth had failed to establish malice beyond a reasonable doubt and had failed to disprove her claim of self-defense beyond a reasonable doubt. In *Commonwealth v. Stoyko*, 504 Pa. 455, 462, 475 A.2d 714, 718 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297, we stated:

> In evaluating this contention [i.e., the defendant's challenge to the sufficiency of the evidence], we view the evidence in the light most favorable to the Commonwealth and, drawing all reasonable inferences therefrom

favorable to the Commonwealth, determine if there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt.

Thusly, we now review the evidence which is as follows: On the morning of Saturday, June 9, 1984, the victim, a 26 year old man, left his home in Johnstown, Pa., to spend the day fishing. He was due to return home before 9:30 p.m. that evening. The members of his family became concerned when he did not return home, and spent Sunday and Monday searching for him in the outdoor areas that he was known to frequent. His brother and brother-in-law discovered the victim's automobile at about 6:30 p.m., on Monday, June 11, and realized by the odor of decay that the victim, who could be seen slumped in the front seat of the vehicle as soon as they started to walk toward the vehicle from the road, was dead. The vehicle was parked on an isolated dirt lane, approximately 150 feet off of Route 601. This location, which was not far from the community of Windber, was well known to the victim who had spent many hours there on outings with his wife and two young children, gathering berries and edible plants.

The victim had been stabbed four times: twice in the back, where the wounds, although superficial, went straight into the body; once under the left armpit, where the three inch deep wound entered the lung and spleen; and once in the left side of the chest, where the two and a half inch wound, which was angled slightly downward and from left to right, pierced the victim's heart, thereby causing his death.[1]

The police, who carefully checked the scene on Monday and Tuesday, found that there were no signs of drag marks or of a struggle in the two and a half foot tall weeds between the vehicle and the road or in the wooded areas in the vicinity of the vehicle. The only blood found outside the

1. The pathologist who performed the autopsy testified that this type of wound is almost always immediately fatal. In his experience, only one person similarly wounded had survived long enough to be "able to turn and address one statement to someone else before collapsing." Notes of Testimony at 303 (Vol. I, Apr. 1, 1985).

vehicle consisted of three drops on the ground right outside of the left driver's door of the vehicle and a smudge of blood near the handle of the left driver's door. The police retrieved a woman's white slip-on canvas shoe from the ground two to three feet away from the right rear bumper of the vehicle.

On the night of June 9, 1984, at about 9:30 p.m., appellee, a 30 year old woman, stood in the middle of Route 601 and flagged down the vehicle of Daniel Varner. She was screaming and appeared to be frightened. Appellee had her purse in one hand and a knife in the other. She begged Mr. Varner to give her a ride, claiming that someone was going to kill her. Mr. Varner would not let appellee get into the vehicle because she had a knife, but he did let appellee sit on the hood of the vehicle, and he told her he would drive her to get help. Appellee appeared to compose herself while riding on the hood of the vehicle, and she placed the knife in her purse.[2] Mr. Varner drove slowly for about one mile and stopped the vehicle near a house with lights. Appellee got off the hood and thanked him for the ride, then Mr. Varner drove away immediately in response to the terrified pleas of his wife, who was a passenger in the car.

Appellee approached the home of Clyde and Elena Boyer shortly before 10:00 p.m., and she was startled by the menacing barks and lunges of their dog, a Doberman pinscher. As Mr. Boyer brought the dog under control, appellee asked Mr. Boyer how far it was to the nearest main road. Appellee, who did not appear to be crying or otherwise frightened or out of breath, stated that she had just punched her boyfriend in the nose. Mrs. Boyer then invited appellee into the Boyer home, where appellee, upon questioning, identified herself and her parents whom appellee stated lived in Richland Township, a nearby community. Appellee again said that she had punched her boyfriend in the nose, and further elaborated that she had run away

**2.** The chemist who tested the physical evidence produced at the trial testified that this purse did not have any blood on either the outside or the inside when he tested it for the Pennsylvania State Police. Notes of Testimony at 109–110 (Vol. I, Apr. 1, 1985).

from him about a mile down the road. Mrs. Boyer noted that the Boyers had just returned to their home along Route 601 and had not seen appellee. Appellee told Mrs. Boyer that she had hidden behind the trees whenever a vehicle approached, fearful that it would be her boyfriend.

Appellee rinsed some blood from the midriff section of her skirt and blouse, and Mrs. Boyer observed that appellee's clothes were not otherwise disheveled, that her hair was neat except for the bangs, and that appellee's makeup was perfect. Appellee indicated that she had used her clothing to wipe the blood from her boyfriend's face before she had run away from him. Mrs. Boyer, who had carefully scrutinized appellee, noticed that appellee did not have any scratches, bruises or brush burns and that appellee was missing one shoe. Appellee turned down Mrs. Boyer's offer to call her parents, whom appellee stated were in Florida, or to call the police.

Mrs. Boyer offered to take appellee back to where she had lost her shoe, and then to take appellee back to Windber where appellee indicated that she wished to go. Appellee directed Mrs. Boyer to the dirt lane on which the victim's vehicle was parked. As soon as they saw the vehicle, appellee stated "he must be looking for me." Notes of Testimony at 290 (Vol. I, Apr. 2, 1985) (hereinafter N.T.). Mrs. Boyer's vehicle stalled, and as soon as she was able to restart it she immediately left the scene, fearful that appellee's boyfriend would come after them. Then, Mrs. Boyer drove appellee to several locations in Windber while appellee tried to decide where to go. Eventually, appellee asked to be let off at what she identified as a friend's place in an apartment complex called Stadium Terrace.

Shortly thereafter, appellee called her boyfriend from her home in Stadium Terrace and the two went to a bar on a date after 11:00 p.m., which date had been planned the day before. According to appellee's boyfriend, appellee was upset and spent a lot of time in the bathroom. When questioned, appellee said she had been throwing up and then told her boyfriend that someone had tried to rape her

and that she had stabbed him. Appellee did not call the police as allegedly urged by her boyfriend. Appellee and her boyfriend left the bar after appellee indicated she just wanted to go home to be with her daughter. The two returned to appellee's apartment, but appellee did not get her daughter from the baby-sitter where her daughter had been since 7:00 p.m., on the evening of Saturday, June 9.

On the morning of Sunday, June 10, appellee went to her baby-sitter's apartment and appellee told her baby-sitter that a man had tried to rape her the night before and that she had stabbed him. The baby-sitter did not believe appellee because appellee related the incident in a completely calm manner. Appellee asked the baby-sitter what she should do, and the baby-sitter suggested that appellee call the police. Appellee arranged to leave her daughter with the baby-sitter through the day so that appellee and her boyfriend could participate in a charity motorcycle event.

Before going to the event, appellee and her boyfriend returned to the dirt lane off Route 601. The victim's car was still there, and appellee retrieved the hairbrush she had dropped, but she was unable to find her shoe. According to appellee and her boyfriend, the victim was nowhere to be seen. Appellee's boyfriend claimed that appellee showed him an area in the weeds where appellee claimed she had been knocked down by the victim. Appellee's boyfriend stated that in a large area about fifteen yards from the road "[t]he weeds were all knocked over and busted up." N.T. at 204 (Vol. I, Apr. 2, 1985).

During the motorcycle event, appellee told her story about an attempted rape to two of her women friends. She told one friend that she had stabbed someone in the arm for trying to rape her. Appellee said that she stabbed him again when he did not stop. Appellee told the other friend once during the motorcycle event and once the next day about the alleged attempted rape and claimed that she had stabbed the man in the stomach. Because appellee related her story in a calm manner and was in good spirits, this friend did not think anything more of the matter.

Later on Sunday evening, appellee went to her boyfriend's home, and from there she called her baby-sitter to

ask if the baby-sitter could continue to care for her daughter, stating that she and her boyfriend had had a little too much to drink to drive back to the plan where appellee and the baby-sitter lived.[3]   Appellee finally returned to her baby-sitter's apartment to get her daughter on Monday morning at which time appellee again mentioned the stabbing to the baby-sitter.   Appellee told her baby-sitter that appellee had returned to the scene and that the car was still there.   Then, appellee again asked the baby-sitter what she should do, and again the baby-sitter told her to go to the police.   Appellee asked the baby-sitter if anything had appeared yet on the news about the incident, and appeared so calm that the baby-sitter again did not believe that anything had happened.   Appellee told her baby-sitter that she and her daughter were going to spend a few days at appellee's boyfriend's place.

The police, acting upon information provided by the Boyers, went to the home of appellee's parents in Richland, late on Monday night.   With the assistance of appellee's parents, the police were able to locate appellee at her boyfriend's residence, and she agreed to join them at her parents' house, where she gave them a statement, after receiving her Miranda warnings, in which she admitted stabbing the victim.

According to appellee's testimony and statements to the police, which statements were admitted into evidence, she had been calling her boyfriend off and on all day Saturday, June 9, and then decided to go to a friend's bar in Windber at about 9:00 p.m., since her boyfriend had not yet phoned her to let her know that he was ready to pick her up for their date.   While walking to Windber, appellee claimed that the victim had stopped his vehicle and offered to give her a ride.   She refused and walked on, but the victim again pulled his vehicle onto the berm, this time angling it toward the guardrails and blocking her path.   Appellee claimed that as she leaned down to again refuse the ride, the victim pulled her hair and dragged her into the vehicle through the

3.   When both appellee and her boyfriend testified at the trial, they stated that they had gotten appellee's daughter from the baby-sitter on Sunday night after the motorcycle event, and that the three of them had spent the night in the boyfriend's home.

passenger's door which he had opened. When the vehicle started rolling, appellee tucked her legs into the vehicle fearing that she would be dragged along the highway, and then she closed the door.

Appellee claimed that she was in a complete state of terror and that she talked constantly to the victim, hoping to thwart what she was certain were his plans to rape and kill her. She claimed that the victim drove straight to the dirt lane off of Route 601,[4] at which time he started to assault her, and she tried to escape by running back toward the paved road, losing a shoe. As the victim chased her, appellee claimed that she reached into her handbag for the knife, but grabbed her hairbrush instead. She threw the hairbrush down and then grabbed the knife, which she hid in her hand next to the purse.[5] The victim knocked her to the ground about 35 to 40 yards from his vehicle, and struggled with her in the tall weeds. When the victim tried to remove her blouse, appellee started to stab him.[6] According to appellee, the victim got up and told her to calm down and that he would drive her back to Windber.[7] Then, appellee saw headlights on the highway and ran to flag down the vehicle.

When appellee was asked by the police if she had any injuries as a result of the attempted rape, all she pointed to were minor scratches on the lower part of her legs. Her boyfriend testified at the trial that appellee's buttocks, thighs and hips were covered with bruises on Monday morning, but appellee had not shown these bruises to the police the next morning when she was giving them her statement.

4. Appellee's first statement to the police contained the assertion that the victim told her, in response to her question as to where they were going, that he was going to visit his sick mother. Appellee's second statement indicated that the victim told her that his route was a shortcut to Richland.

5. The knife has been described as an eleven inch kitchen utility knife.

6. The victim was 5' 9" tall and weighed 165 pounds. Appellee is 5' 6" tall and weighed approximately 116 pounds at the time of the killing.

7. In the second statement that appellee made to the police, she stated that she ordered the victim to drive her back to Windber after he stood up.

■ Pursuant to our Crimes Code, "a person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S.A. § 2501(a). "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). An intentional killing is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d). In order to convict a defendant of murder of the first degree, the Commonwealth must prove beyond a reasonable doubt that (1) the defendant has killed another (2) willfully, deliberately and with premeditation (otherwise referred to as with malice), and (3) without lawful justification.

There is no dispute herein that appellee caused the death of the victim. What has been disputed is whether the Commonwealth's evidence was sufficient to disprove appellee's claim of self-defense (or lawful justification) beyond a reasonable doubt. Superior Court, in reviewing the evidence, found that the Commonwealth had not disproved self-defense beyond a reasonable doubt, and that, therefore, the Commonwealth could not establish malice beyond a reasonable doubt.

■ The relationship between a claim of self-defense and the element of malice has been described as follows: "[i]n a prosecution for murder, evidence of provocation or self-defense tends to negate the malice required to prove murder." *Commonwealth v. Heatherington*, 477 Pa. 562, 568, 385 A.2d 338, 341 (1978). Further, in order to meet its burden of proof on the element of malice, the Commonwealth must exclude self-defense beyond a reasonable doubt. *Id.*

The Superior Court highlighted the following evidence to support its finding that the Commonwealth did not disprove appellee's claim of self-defense beyond a reasonable doubt:

The Commonwealth's evidence showed that Carbone and Lint did not know each other; that Lint was driving and Carbone was on foot; that Lint was familiar with the remote area where his body was found, and in fact, that it was one of his favorite stopping points; that immediately

after the incident Carbone flagged down a car, seeking help and screaming that someone was going to kill her; that, following the incident, Carbone told numerous people that she stabbed a man because he tried to rape her. 375 Pa.Super. 261, 273, 544 A.2d 462, 467 (1988).

It is clear that Superior Court failed to review the evidence in the case in the light most favorable to the Commonwealth. What the Superior Court has overlooked is that appellee was armed with a deadly weapon and the victim was not so armed; that the victim's wounds were such that he could not have gotten up after being stabbed, then walked 35 to 40 yards back to his vehicle, and then opened the door on the driver's side and gotten into his vehicle; that there were no flattened weeds in the area of the victim's vehicle to indicate that an attempted rape had taken place as claimed by appellee; that appellee lied to the Boyers about why she suddenly appeared at their home on a Saturday night with blood on her clothes; that appellee's neat appearance after the incident did not support her claim of attempted rape; that appellee's friends did not believe her story about an attempted rape; that appellee never tried to contact the authorities, in spite of being advised to do so on numerous occasions; that appellee and her boyfriend told remarkably consistent stories which were, in part, contradicted by other witnesses; and that numerous witnesses testified as to the peaceful and non-violent reputation of the victim.

In defining the term "reasonable doubt," this Court has stated that:

Reasonable doubt is neither excessively timid nor excessively bold. It is not to be gauged by the actions of the man who would hesitate to cross a bridge resting on concrete piers and suspended by indestructible steel; nor by the actions of the man who would cross a bridge against fifty angels warning him that the piers had crumbled and the spans had fallen. Reasonable doubt is the doubt of a reasonable man. When the reason, like a bird flying over the sea, looks in vain for a substantial object on which to rest and fold its wings of perplexity, it

can be said that the mind is in a state of reasonable doubt.

*Commonwealth v. Clinton,* 391 Pa. 212, 219, 137 A.2d 463, 466 (1958).

Although the Commonwealth is required to disprove a claim .of self-defense arising from any source beyond a reasonable doubt, a jury is not required to believe the testimony of the defendant who raises the claim. *See Commonwealth v. Hinchcliffe,* 479 Pa. 551, 556, 388 A.2d 1068, 1071 (1978) (fact finder may believe any, all, or none of any witness's testimony), *cert. denied,* 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 663. Appellee's story of an attempted rape could well have not been believed by the jury. The fabrication of false and contradictory statements by an accused are evidence from which a jury may infer that they were made with "an intent to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt." *Commonwealth v. Gockley,* 411 Pa. 437, 453, 192 A.2d 693, 701 (1963). Appellee told the Boyers, when she arrived at their home after dark with blood on her clothes, that she had punched her boyfriend in the nose. She also told her boyfriend, her women friends, her baby-sitter, and the police that the victim had tried to rape her when, in fact, the physical evidence belied any such assault having occurred. The testimonial and physical evidence presented by the Commonwealth negated appellee's version of the incident leading to the victim's death, and gave the jury "a substantial object on which to rest and fold" the wings of their perplexity. Thus, there was sufficient evidence for the jury to find beyond a reasonable doubt that appellee was not acting in self-defense when she killed the victim.

Moreover, where there is evidence from which a jury can reasonably infer malice, the Commonwealth has met its burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *Hinchcliffe, supra,* 479 Pa. at 557, 388 A.2d at 1071. It has long been the law of this Commonwealth that "the use of a deadly instrument on a vital part of the body is sufficient to establish the specific intent to kill required for a conviction

of first degree murder." *Commonwealth v. Butler,* 446 Pa. 374, 378, 288 A.2d 800 (1972). There is no dispute herein that appellee stabbed the victim with a knife in his back and chest, inflicting a fatal wound to the heart. The jury was justified therefore in finding that the Commonwealth had established the element of malice beyond a reasonable doubt.[8]

Accordingly, we reverse the order of the Superior Court and reinstate the judgment of sentence entered by the Court of Common Pleas of Somerset County.

## ORDER OF COURT

### Decided: August 15, 1990

PER CURIAM

The Applications for reargument, reconsideration and stays are denied and the mandate of this Court's opinion entered May 10, 1990 is amended to read: Accordingly, we reverse the order of the Superior Court, reinstate the judgment of sentence entered by the Court of Common Pleas of Somerset County and remand to Superior Court for disposition of the remaining issues not disposed of by the Superior Court.

8. Appellee, Patricia Ann Carbone, urges this Court to find that she was denied her right to a fair trial in that the victim's widow was permitted to sit, over objection, at counsel table for the prosecution during voir dire and at trial. As a general rule, there is nothing inherently prejudicial about the presence of a member of the victim's family at the prosecutor's side. Indeed, the prosecutor has some discretion in choosing those persons with whom he or she wishes to consult at counsel table during trial.

In the case at bar, the trial court specifically found that there was no actual prejudice to the defendant in that the widow's "appearance and behavior throughout both jury selection and trial were impeccable; she was quiet and her manner and demeanor were unobtrusive." Opinion of the Court at 47 (Mar. 25, 1986). It is obvious that the victim's widow would have attracted the same attention during the proceedings had she sat in the front benches of the courtroom immediately behind the railing and adjacent to counsel table.

Additionally, the trial court, in its charge to the jury, cautioned the jury against rendering a verdict based on passion or prejudice, and noted that the jurors were not to base their decision on sympathy for either the appellee or the family of the victim. *Cf. Commonwealth v. Gartner,* 475 Pa. 512, 381 A.2d 114 (1977) (emotional outburst by mother of victim did not necessitate a mistrial where court cautioned jury not to be influenced by sympathy for family of decedent).