J-S09005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KOLBRIN HOLYFIELD | : | |
| | : | |
| Appellant | : | No. 320 WDA 2022 |

Appeal from the Judgment of Sentence Entered October 26, 2021
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007654-2017

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: JULY 17, 2023**

Appellant, Kolbrin Holyfield, appeals from his judgment of sentence of life imprisonment without the possibility of parole, imposed following his non-jury trial conviction for homicide in the first degree.  Appellant submits that the Commonwealth failed to disprove beyond a reasonable doubt that he acted in self-defense.  We affirm.

Shortly after midnight on May 21, 2017, Appellant saw the victim, Dahrique Smith, inside the Rowdy Buck bar in the South Side area of Pittsburgh.  Appellant testified that he believed Smith had killed Appellant's brother and that Smith planned to kill Appellant, too.  Appellant left the bar but reentered one minute and thirty seconds later, claiming that he was looking to get a ride from his companions.  One minute and six seconds after that, Appellant shot and killed Smith.  Appellant claimed at trial, and reiterates on appeal, that he fired only after Smith made remarks indicating that he

would kill Appellant, followed by Smith's approaching Appellant in an aggressive manner. The Commonwealth, in contrast, submits that the trial court correctly determined that Appellant harbored the specific intent to kill Smith when he reentered the bar and, therefore, the Commonwealth successfully disproved beyond a reasonable doubt his self-defense claim.

The trial court prepared a thorough Pa.R.A.P. 1925(a) opinion addressing Appellant's concise statement of matters complained of on appeal, which cogently sets forth the essential facts:

> On May 21, 2017, at approximately 12:40 a.m., [Appellant] shot and killed Dahrique Smith at the Rowdy Buck bar located on the South Side of Pittsburgh before immediately fleeing the scene. Mr. Smith received first aid treatment from a responding officer within less than a minute of being shot, and, although medics arrived approximately three (3) to five (5) minutes later to transport him to Mercy Hospital, Mr. Smith ultimately succumbed to the two (2) gunshot wounds that he sustained to his chest, which had lacerated his lungs and aorta.
>
> The evidence presented at trial established that [Appellant] shot Mr. Smith while they were inside … the Rowdy Buck, and that Mr. Smith stumbled outside and collapsed on the corner of East Carson and South 14th Street. No weapons were found on Mr. Smith's person or within his vicinity, and the officers on scene did not observe anyone removing anything from Mr. Smith while he was lying in a pool of his own blood on the sidewalk. The crime scene investigation led to the discovery of two (2) spent shell casings "immediately inside of the threshold of the [bar] door" next to a beer cooler. Subsequent analysis of the casings revealed that they were discharged from a Glock 17 firearm with a laser grip, bearing Serial Number YCL923. The Glock 17 was registered to [Appellant] and in his possession as of August 15, 2016.
>
> On June 20, 2017, a month after the shooting, [Appellant] was arrested at his residence by the United States Marshals Fugitive Taskforce. [Appellant] had been apprehended after officers pieced together his identity through witness interviews and video

surveillance from the Rowdy Buck and surrounding establishments.

The surveillance footage from the Rowdy Buck shows that [Appellant] initially entered the bar with three (3) individuals and remained there for approximately 26 minutes. The video then depicts [Appellant] leaving the bar for approximately one minute and 30 seconds and then reentering, but this time with the bulge of a firearm visible in his front waistband. Approximately one minute and six (6) seconds later, [Appellant] is seen firing his laser-grip Glock 17 at Mr. Smith, and Mr. Smith is shown "being shot and running out of the bar." Immediately prior to the shooting, the video shows Mr. Smith "walking over to the direction where the shooting [wa]s about to occur…." From what can be seen on the video, Mr. Smith was not carrying a gun in his hands, only a cell phone in his left hand and a drink in his other hand. The video shows Mr. Smith being shot, and it then captured [Appellant] running out of the bar, chasing after Mr. Smith, with his Glock 17 still in his left hand.

A search of [Appellant]'s residence, which was conducted on the same day as his arrest, led to the recovery of the maroon T-Shirt, Nike Shoes, and tan cargo shorts that the surveillance footage shows [Appellant] wearing on the night of the shooting. Although officers recovered a Glock 23 firearm and ammunition in the residence, the weapon that [Appellant] used to kill Mr. Smith - - a Glock 17 bearing Serial Number YCL923 - - was never found. The search of [Appellant]'s home revealed that [Appellant] had purchased the Glock 23 firearm on June 3, 2017, just two (2) weeks after the shooting, at a pawnshop in North Versailles.

[Appellant] ultimately did not dispute his identity as the shooter at trial. Rather, [Appellant] took the stand and testified that he killed Mr. Smith in self-defense.

Trial Court Opinion (TCO), 7/20/22, at 5-7 (citations and footnote deleted).

Appellant filed a timely notice of appeal and complied with the court's order to file a Pa.R.A.P. 1925(b) statement. Appellant raises one issue on appeal: "Is the evidence of record insufficient as a matter of law to support [Appellant]'s conviction for first-degree murder where the Commonwealth

failed to disprove beyond a reasonable doubt that [Appellant]'s use of deadly force was undertaken in either 'perfect' or 'imperfect' self-defense, negating the essential element of malice?" Appellant's Brief at 3.

"If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt." *Commonwealth v. Houser*, 18 A.3d 1128, 1135 (Pa. 2011). This calls for a review of the sufficiency of the evidence supporting the contrary verdict, *i.e.*, the trial court's determination that Appellant specifically intended to kill Smith and that the Commonwealth concomitantly disproved the self-defense claim. *See id*. We apply the following principles of review:

> In determining whether there was sufficient evidence to support a jury's finding, we are "obliged to determine whether the evidence presented at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to satisfy all elements of the offense beyond a reasonable doubt." *Commonwealth v. Brown*, … 987 A.2d 699, 705 ([Pa.] 2009) (citing *Commonwealth v. Baumhammers*, … 960 A.2d 59, 68 ([Pa.] 2008)). To convict a defendant of first[-]degree murder, the Commonwealth must prove: a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Brown*, [987 A.2d] at 705; *Commonwealth v. Sherwood*, … 982 A.2d 483, 491–92 ([Pa.] 2009) (citations omitted). The Commonwealth may use solely circumstantial evidence to prove a killing was intentional, and the fact-finder "may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Brown*, [987 A.2d] at 705 (quoting *Commonwealth v. Blakeney*, … 946 A.2d 645, 651 ([Pa.] 2008)). Malice, as well, may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Gardner*, … 416 A.2d 1007, 1008 ([Pa.] 1980) (citations omitted).

*Commonwealth v. Houser*, 18 A.3d 1128, 1133–34 (Pa. 2011).

The right to use deadly force in defense of self is established by statute:

**(a) Use of force justifiable for protection of the person.--** The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.**--

. . . .

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505. A self-defense claim is comprised of three elements:

(1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

*Commonwealth v. Steele*, 234 A.3d 840, 846 (Pa. Super. 2020).

The first element "encompasses two aspects, one subjective and one objective." *Commonwealth v. Mouzon,* 53 A.3d 738, 752 (Pa. 2012).

- 5 -

Subjectively, Appellant "must have acted out of an honest, *bona fide* belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind." *Id.* (quotation marks omitted). This belief, "if it existed, must be reasonable in light of the facts as they appeared to the defendant," which involves an objective analysis. *Id.* If the belief is objectively reasonable, Appellant is entitled to acquittal, as the use of force was lawfully justified. If, however, Appellant's subjective belief was objectively unreasonable, then he acted in "imperfect self-defense," which "exists where the defendant actually, but unreasonably, believed that deadly force was necessary." *Commonwealth v. Truong*, 36 A.3d 592, 599 (Pa. Super. 2012) (*en banc*) (citing 18 Pa.C.S. § 2503(b)). "However, all other principles of self-defense must still be met in order to establish this defense." *Id.*

Because all three elements must be met to establish a statutory entitlement to self-defense, the Commonwealth prevails if it disproves beyond a reasonable doubt any of the three elements. *Mouzon*, 53 A.3d at 740. In disproving a self-defense claim, the Commonwealth cannot prevail merely by convincing the fact-finder that the defendant's testimony is not credible. *Commonwealth v. Torres*, 766 A.2d 342, 345 (Pa. 2001). By the same token, the fact-finder is not required to believe the defendant's testimony; as always, it may accept, reject, or credit testimony as it sees fit. *Commonwealth v. Rivera*, 983 A.2d 1211, 1222 (Pa. 2009).

For ease of discussion, we first discuss Appellant's view of the facts. We are mindful that, as an appellate court, we must view the facts in the light most favorable to the Commonwealth as the verdict winner. That said, Appellant's legal arguments are largely driven by the version of events set forth in his testimony, which he claims the Commonwealth did not contest and, therefore, did not disprove beyond a reasonable doubt. We thus begin with that version of events.

Appellant worked as a studio engineer recording music. One of the artists he worked with was his half-brother, Reno Wallace (a/k/a "Trillzee"). In 2015, Trillzee recorded a track with lyrics disparaging Smith. According to Appellant, he objected to this content, but Wallace decided to release the track anyway. Appellant testified that Wallace called him a few weeks later, telling Appellant that Smith was angry about the song, that there was a hit out for them, and that Smith was violent and known to carry guns. As a result, Appellant "stopped going out, stopped performing in the city, and became very selective about the artists with whom he would record music." Appellant's Brief at 8. Two months after this conversation, Wallace was shot and killed while at Wallace's recording studio. Three other members of Wallace's rap group were present but survived. According to Appellant, he "learned from one of the surviving victims that Smith was the shooter." *Id.*

Due to his belief that Smith killed his half-brother, Appellant feared that Smith would kill him and, thus, he "continued to stay to himself and stay home." *Id.* at 9. The night of Smith's murder was an exception to this general

practice, as Appellant decided to watch his friend, Joel Kellem, perform at a venue in Pittsburgh's Mt. Oliver neighborhood. *Id.* His mother gave him a ride to the venue, and the plan was for Kellem to give Appellant a ride home. When that plan fell through, Appellant obtained a ride from Aneesa Fulton, a friend who was also present for Kellem's show. Fulton and her friend, Jimikia Wiley, suggested going to the South Side neighborhood. Appellant reluctantly agreed, as he "didn't want to be a 'party pooper.'" *Id.* at 10 (quoting transcript). Appellant did not initially remain with the group, opting to try to get a tattoo that he had wanted. However, the tattoo's design was saved to Appellant's phone, which had died by this point in the evening. Appellant then found Fulton and Wiley waiting in line at the Rowdy Buck, where he made the fateful decision to join them.

Approximately twenty minutes after entering the Rowdy Buck, Appellant realized that Smith was there. Appellant's "first reaction was to leave the bar," and he did so. *Id.* at 12. Believing Fulton and Wiley to be outside smoking cigarettes, Appellant looked for them so he could get a ride home. "He didn't find them outside, and reentered the Rowdy Buck to 'grab the girls and go home.'" *Id.* (quoting transcript). Appellant purposefully avoided Smith by walking towards the opposite side of the bar. But "it became clear that Smith spotted [Appellant]." *Id.* at 13-14. Smith acted aggressively, and Appellant testified "that he heard and watched as Smith said, 'You're next.'" *Id.* at 15 (quoting transcript). Appellant believed this meant that Smith would

kill him just like he had killed his half-brother. Appellant summarized what happened next:

> Unable to see Smith as Smith ostensibly approached his location, [Appellant] testified that he could hear Smith screaming, "I'm sending you to Trillzee." This alarmed [Appellant], as he believed that Smith, who was known to carry a gun, "was going to make good on his threat." Bolstering his belief that Smith was armed, [Appellant] knew that Smith would not have been patted down for weapons before entering the Rowdy Buck, just as [Appellant] himself had not been.

> A "full shot of adrenaline shot through" [Appellant]'s body as he heard Smith scream, "I'm sending you to Trillzee." [Appellant] tried to determine his means of escape. He could not proceed toward the back of the club because it was so congested with other people. He would be trapped. He raced toward the front of the club to try to exit onto Carson Street, ahead of Smith. As he moved toward the front of the club, [Appellant] drew his firearm in order to protect himself in the event that Smith beat him to the exit. [Appellant] watched as Smith suddenly appeared from behind a partition and came at him "sideways" with "his right hand out of sight."

> [Appellant] believed Smith to be reaching for his gun. [Appellant] twice fired his lawfully carried firearm in quick succession in Smith's direction "[t]o make him go away, get away from me. So I can go home."

Appellant's Brief at 15-16 (citations to transcript and footnote omitted).

Appellant argues that when viewing the facts and reasonable inferences drawn therefrom, the Commonwealth did not meet its burden to disprove self-defense. We disagree, as we conclude that the Commonwealth successfully established that Appellant did not subjectively fear that Smith posed an imminent threat.

On this crucial point, Appellant argues that "the events that unfolded on the night of the shooting simply cannot be divorced, in an intellectually honest

- 9 -

way, from the preceding[,] extremely violent events perpetrated by Smith." Appellant's Brief at 32.[1] Appellant attaches far too much significance to the Commonwealth's alleged failures to rebut Appellant's mental state. *See id.* ("Indeed, the violence perpetrated by Smith against [Appellant]'s family, which went unchallenged by the Commonwealth, unquestionably bore on [Appellant]'s state of mind on the night of the encounter."); *id.* at 33 ("Critically, the Commonwealth did not in any way dispute, much less contradict, [Appellant]'s account of the history of violence and terror that Smith perpetrated."); *id.* at 34 ("This unchallenged history undeniably supports that [Appellant] held an honest, *bona fide* fear of Smith—albeit a general fear—leading up to the night in question."); *id.* at 36 (arguing that Appellant's decision to reenter the Rowdy Buck "neither raises a reasonable inference of an intent to commit murder nor disproves his claim that he was generally terrified of Smith"); *id.* at 43 (asserting that, when Smith displayed aggression in the Rowdy Buck, "[Appellant]'s fear of Smith was transformed from an honest and *bona fide,* but generalized, fear of Smith to an honest, *bona fide* and acute belief that the use of deadly force was necessary to protect himself against imminent death or serious bodily injury").

We dispose of these points by reference to the familiar proposition in conducting a sufficiency review that "[t]he Commonwealth need not preclude

---

[1] As the trial court opinion notes, Reno Wallace's murder remains unsolved. Thus, Appellant's remarks are overstated, as the "extremely violent events perpetrated by Smith" are not objectively established facts but rather things that Appellant professed to believe on the night of Smith's death.

- 10 -

every possibility of innocence or establish the defendant's guilt to a mathematical certainty." ***Commonwealth v. Williams***, 871 A.2d 254, 259 (Pa. Super. 2005) (quotation marks and citation omitted). Applied to the self-defense scenario, the Commonwealth need not definitively disprove Appellant's own description of his mental state. Appellant offers no precedent for the proposition that the fact-finder must simply accept a defendant's testimony in the absence of objective proof to the contrary. While the Commonwealth cannot simply rely on the fact-finder's disbelieving the defendant's version of events, the question for sufficiency review is whether any rational fact-finder could make the required inferences. The Commonwealth's "standard of review follows the United States Supreme Court's approach as articulated by ***Jackson v. Virginia***, 443 U.S. 307 (1979)[.]" ***Commonwealth v. Holt***, 273 A.3d 514, 528 (Pa. 2022). "***Jackson*** leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" ***Coleman v. Johnson***, 566 U.S. 650, 655 (2012).

To the extent Appellant asserts that the only justifiable, rational inferences to be drawn from Appellant's behavior must proceed from the presumption that his state of mind was uncontradicted and therefore must be accepted as true, we disagree. Absent a statement by Appellant to another person, no direct proof of his mental state could ever be produced. It is axiomatic that, "[a]s intent is a subjective frame of mind, it is of necessity

- 11 -

difficult of direct proof." ***Commonwealth v. Matthews***, 870 A.2d 924, 929 (Pa. Super. 2005), *aff'd*, 909 A.2d 1254 (Pa. 2006). Similarly, whether Appellant believed that Smith had killed his half-brother and intended to kill Appellant is something that can be known only to Appellant. It is well-settled that the Commonwealth "may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence," ***Commonwealth v. Williams,*** 255 A.3d 565, 578 (Pa. Super. 2021) (quoting ***Commonwealth v. Smith***, 97 A.3d 782, 790 (Pa. Super. 2014)), and it follows that the same is true with respect to disproving self-defense. ***See Commonwealth v. Torres***, 766 A.2d 342, 344 (Pa. 2001) ("[The a]ppellant contends that ... the Commonwealth failed to disprove his claim of self-defense. In reviewing a claim based upon the sufficiency of the evidence, the appellate court must view all the evidence in the light most favorable to the verdict winner…."). Therefore, we may examine circumstantial evidence in assessing whether Appellant's claim to be subjectively afraid was rebutted beyond a reasonable doubt.

Having rejected the argument that we must accept that Appellant subjectively believed Smith posed a threat, we are left to examine whether the rational inferences drawn from Appellant's behavior preceding, during, and after the shooting, support the trial court's verdict that Appellant specifically intended to kill Smith. Cases addressing self-defense claims readily support the notion that we may examine whether Appellant's behavior is consistent with his alleged fear of Smith, including his flight and concealment of evidence.

Our precedents have dealt with this point in the analogous scenario of a deadly encounter between the victim and defendant, with only the defendant surviving to tell his or her side of the story. In ***Commonwealth v. Carbone***, 574 A.2d 584 (Pa. 1990), Patricia Carbone was convicted of murder in the first degree, and our Supreme Court held that the Commonwealth sufficiently disproved her claim of self-defense. There, the victim went fishing on a Saturday and did not return home. Family members spent the next two days checking the victim's usual fishing spots and, on Monday, found the victim's body in his car, which was parked on an isolated dirt lane approximately 150 feet off a road. The victim had suffered four stab wounds, one of which pierced his heart.

Police learned that Carbone had flagged down a vehicle on Saturday evening at about 9:30 p.m. "She was screaming and appeared to be frightened. [Carbone] had her purse in one hand and a knife in the other. She begged [the driver] to give her a ride, claiming that someone was going to kill her." ***Id.*** at 586. The driver dropped her off at a house, which Carbone entered. The residents told police that Carbone "did not appear to be crying or otherwise frightened or out of breath, [and] stated that she had just punched her boyfriend in the nose." ***Id.*** Carbone turned down offers to call the police. Shortly thereafter, she went on a scheduled date with her boyfriend. She told him that someone had tried to rape her. Carbone declined her boyfriend's suggestion to call the police and stated that she wanted to go home to be with her daughter. On Sunday morning, Carbone visited the baby-

- 13 -

sitter and again relayed that she had been raped. The baby-sitter likewise suggested that Carbone call the police.

An *en banc* panel of the Superior Court determined that the Commonwealth failed to present sufficient evidence to justify a verdict of any degree of murder, and remanded for a new trial on whether Carbone was guilty of voluntary manslaughter. The Commonwealth appealed and the Supreme Court ordered the reinstatement of the verdict, explaining that the *en banc* panel had failed to view the evidence in the light most favorable to the Commonwealth as the verdict winner:

> It is clear that [the] Superior Court failed to review the evidence in the case in the light most favorable to the Commonwealth. What the Superior Court has overlooked is that [the] appellee was armed with a deadly weapon and the victim was not so armed; that the victim's wounds were such that he could not have gotten up after being stabbed, then walked 35 to 40 yards back to his vehicle, and then opened the door on the driver's side and gotten into his vehicle; that there were no flattened weeds in the area of the victim's vehicle to indicate that an attempted rape had taken place as claimed by [the] appellee; that [the] appellee lied to the Boyers about why she suddenly appeared at their home on a Saturday night with blood on her clothes; that [the] appellee's neat appearance after the incident did not support her claim of attempted rape; that [the] appellee's friends did not believe her story about an attempted rape; that [the] appellee never tried to contact the authorities, in spite of being advised to do so on numerous occasions; that [the] appellee and her boyfriend told remarkably consistent stories which were, in part, contradicted by other witnesses; and that numerous witnesses testified as to the peaceful and non-violent reputation of the victim.

*Id.* at 589. Additionally, the **Carbone** Court observed that "[t]he fabrication of false and contradictory statements by an accused are evidence from which a jury may infer that they were made with an intent to mislead the police or

- 14 -

other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt." ***Id.*** (quotation marks and citation omitted). Carbone had offered contradictory stories (punching her boyfriend versus an alleged rape) and that was a factor supporting a finding of first-degree murder.

***Commonwealth v. Ward***, 188 A.3d 1301 (Pa. Super. 2018), is another example of a case where the appellant, as in the case at bar, claimed that the Commonwealth failed to negate his own self-serving testimony about the circumstances requiring a use of force in self-defense. In that case, a citizen heard gunshots and looked outside her window. Seeing a vehicle that appeared to be stopped, she went outside to see if anyone was injured. She heard four more shots and saw sparks coming from the back of the car. The citizen called 911 and police found Jason Eubanks and Cherylann Sabatasso dead in the car. Tracks led to Ward's home.

Ward testified that he had called Eubanks to obtain cocaine. Eubanks then arrived at Ward's house with Sabatasso, Ward's girlfriend, driving. Ward testified that he got in the back. As they drove, Sabatasso argued with Ward about Ward's informing Eubanks that Sabatasso had cheated. Ward claimed that Eubanks told everyone to calm down, with Ward's questioning Eubanks's manhood in response. Ward said that Eubanks then pulled a gun on Ward, and the two men struggled. According to Ward, Sabatasso was accidentally shot in the head when she abruptly stopped the car. Ward explained that he and Eubanks continued to struggle for control of the gun, with Ward prevailing. Ward shot Eubanks twice during this incident. Ward then "ran home, placed

- 15 -

the bullets from the gun into a sock, put his bloody clothing in a plastic bag, and hid the gun under a kitchen cabinet." **Id.** at 1305. Ward argued on appeal that the jury's verdict rested on disbelieving his account. The ***Ward*** Court disagreed:

> In the instant case, [Ward] offered multiple versions of his actions on the day of the shootings. In his initial statement to the police, [Ward] indicated that Mr. Eubanks was supposed to come to [Ward's] house on the day of the shooting, but that Mr. Eubanks never appeared. [Ward] also offered three different versions of how he got from his home on Rochelle Street to his mother's house: that he had walked, that he drove … there, and that he had driven a different, unidentified person's car there. [Ward] first placed himself home alone at 302 Rochelle Street during the evening in question, including at the time Mr. Eubanks and Ms. Sabatasso were killed. Then he claimed that he called his friend to meet at a local bar to toast Mr. Eubanks. [Ward] indicated that he learned of Mr. Eubanks's death because [Ward] was standing on the porch of 302 Rochelle Street when an unidentified person walked by and informed him that there were two people dead in a vehicle; [Ward] figured it was Mr. Eubanks and Ms. Sabatasso based upon the description of the car. [Ward] initially denied having gone to the crime scene, but later contradicted that statement and said that he went to the corner after hearing a gunshot, and called Mr. Eubanks's phone upon seeing the Lexus in the middle of the intersection.
>
> Additionally, the Commonwealth offered evidence that a sock containing bullets and a plastic bag containing bloody clothing were recovered from a wooded area at the end of [Ward's] street. A pistol and magazine were retrieved from under a cabinet in the kitchen at 302 Rochelle Street. The jury could conclude from [Ward's] attempts to conceal or dispose of evidence of his involvement in the shootings constituted evidence of guilt [*sic*].

**Id.** at 1305–06 (citations omitted).

Cases of self-defense will necessarily be fact-specific, and the instant facts do not contain the same type of inconsistencies as in ***Carbone*** and

- 16 -

***Ward***.  The video surveillance evidence in the case *sub judice* establishes several key facts: Appellant's time of entry, how long he remained inside before exiting, how long he was inside before the shooting, and portions of the encounter that led to Smith's death.  But unless we are required to accept Appellant's description of his state of mind, a conclusion we have rejected, we agree with the trial court that several specific contradictions and inconsistencies are relevant to whether the Commonwealth disproved Appellant's claim of self-defense.

Viewing the evidence in the light most favorable to the Commonwealth, the trial court's factual findings justify its conclusion that Appellant specifically intended to kill Smith upon reentering the bar.  And if the evidence sufficiently supports that Appellant specifically intended to kill Smith, that verdict is incompatible with self-defense, as "malice and self-defense are mutually exclusive concepts."  ***Commonwealth v. Hinchcliffe***, 388 A.2d 1068, 1071 (Pa. 1978).[2]  In other words, if Appellant reentered the Rowdy Buck with the specific intent to kill, then there could be no lawful use of deadly force in self-defense.  Even if Appellant were correct that Smith had planned to kill him at some point in the future, the use of force statute does not authorize vigilantism; Appellant could not have sought out Smith and assassinated him.

_____

[2] "Pennsylvania retains the common law definition of murder, which is a killing conducted 'with malice aforethought.'" ***Commonwealth v. Packer***, 168 A.3d 161, 168 (Pa. 2017) (citation omitted).  "Third-degree murder is defined as 'all other kinds of murder,' *i.e.*, those committed with malice that are not intentional (first-degree)…." ***Id.***  (citation omitted).

Thus, the trial court's verdict of first-degree homicide overlaps with its rejection of Appellant's assertion of self-defense. We now address the specific findings and inferences that support the verdict.

Beginning with Appellant's decision to proceed to the South Side after Kellem's show, Appellant testified that he expected Fulton to immediately drive him home. The trial court credited Fulton's testimony that she, Appellant, and Wiley jointly decided to go to the South Side prior to Appellant's getting in her car. TCO at 25 ("Fulton directly rebutted that claim…."). This factual finding severely undermines Appellant's testimony that he was so afraid of Smith that he simply refrained from leaving his home for fear he would run into Smith. Relatedly, the trial court discredited Appellant's testimony that he reentered the bar to find his friends for a ride home as inconsistent with his purported fear. "Ultimately, despite the great lengths to which [Appellant] went to describe the history between [Appellant] and Mr. Smith so that he could show … he was in legitimate fear of him at the time of the shooting, his testimony cannot be reconciled with his actions on the night of the murder." *Id.* at 21. As the trial court pointed out, Appellant agreed on cross-examination that he knew his friends wanted to barhop.[3]

_____

[3] Appellant states that the trial court takes an "extraordinarily dim view of human kindness" because "it simply defies common sense and notions of basic human decency that the girls would deny [Appellant] a ride home if he explained" the situation. Appellant's Brief at 38 n.18. Of course, it also defies common sense and expectations of decency that Appellant's friends would force him to go to the South Side in the first place if he had so objected. In
*(Footnote Continued Next Page)*

Furthermore, contrary to Appellant's attempts to paint the verdict as resting solely on an assessment of why he reentered the Rowdy Buck, the trial court made additional findings concerning Appellant's encounter with Smith and why those facts established his specific intent to kill. For example, Appellant claims that his generalized fear transformed into a specific fear after Smith made aggressive overtures. The trial court appropriately reasoned that it would have to "first accept that Mr. Smith was able to recognize [Appellant] in a dark, loud, and crowded bar when the only evidence that Mr. Smith even knew what [Appellant] looked like was [Appellant]'s testimony that Mr. Smith was 'probably going to recognize' him" due to the fact Appellant and his murdered brother Reno were half-siblings and thus looked alike. *Id.* at 32. Similarly, Appellant believed that Smith "realized" who Appellant was, but the court found it extremely unlikely that Smith "would be able to almost instantly recognize [Appellant] upon seeing him for the first time in a dark room, on a dance floor that had over 50 people dancing, unless [Appellant] made sure to put himself in his clear view." *Id*. In contrast, Appellant testified that he knew what Smith looked like, as Reno had shown Appellant social media

_____

any event, the trial court did not appear to be making predictions of what Appellant's friends would do if asked, but rather observing that Appellant's explanations for why he chose to reenter the Rowdy Buck were not credible in the aggregate. *See also* TCO at 26 (noting that Appellant explained he did not want to call his mother for a ride because he would have "gotten an earbeating"; "This is just another instance where [Appellant]'s testimony was incredible and illogical, as the court is quite sure that his mother would have rather been woken from her sleep … than risk losing another child….") (citations omitted).

pictures of Smith when warning Appellant. *Id.* at 32. The trial court could rationally conclude that the deadly encounter, which took place one minute and nine seconds after Appellant reentered the bar, was effectively initiated by Appellant.

Setting aside the implausibility of Smith's immediately recognizing Appellant, the trial court went on to conclude that Appellant's testimony about hearing Smith was not believable. Appellant claimed that he heard Smith make specific threatening comments. The trial court determined that he could not have done so, as there was ample testimony establishing that the bar was crowded and playing loud music. In fact, Appellant is observed on the video surveillance speaking directly into a woman's ear in order to be heard over the din. *Id.* at 33 (citing Commonwealth's Exhibit 67). While the video does show Smith "mov[ing] his head sharply prior to walking" towards Appellant, Appellant is not visible on the video. *Id.* The trial court found that this suggests that Appellant made his presence known to Smith first. *Id.* at 34. Additionally, police officers immediately converged on the Rowdy Buck, with the first reaching Smith's body within one minute. No weapon was found on Smith. *See Carbone*, 574 A.2d at 589 (noting that the defendant "was armed with a deadly weapon and the victim was not so armed"). These findings, and the rational inferences to be drawn from them, are not based on a mere disbelief of Appellant's testimony. *See Commonwealth v. Jones*, 271 A.3d 452 (Pa. Super. 2021) (concluding that Commonwealth disproved self-defense where the appellant shot victim after a bar fight; noting that no weapon was

found on the victim, none of the witnesses saw the victim with a weapon, and threats made by the victim did not involve use of a firearm or a weapon).

Turning to events transpiring after the shooting, we agree that Appellant's actions after the shooting dispel any lingering doubt regarding the strength of the foregoing circumstantial evidence. A rational fact-finder could conclude that if Appellant truly acted in self-defense he would have immediately told responding authorities what had happened. Instead, Appellant fled the scene. Even charitably accepting Appellant's claim that he was uncertain if he had struck Smith and was therefore worried about retaliation, he testified that he learned of Smith's death the next day. He did not attempt to contact the authorities at any point over the next month and was ultimately arrested by a fugitive task force. Appellant also actively destroyed evidence. Whether he discarded the firearm while fleeing from the Rowdy Buck (as the trial court determined was likely the case) or gave it to his father (as Appellant claims), the fact remains that Appellant's concealment and flight are valid considerations in assessing whether he truly acted in self-defense, as they were in *Carbone* and *Ward*.

The trial court also found that Appellant's testimony about how he managed to leave the South Side was not credible. According to Appellant, he obtained a ride from Fulton after the shooting when the entire crowd began to flee from the bar. But he did not tell Fulton what had happened. In fact, Appellant stated that he did not follow Fulton and Wiley to Fulton's car because he went to look for another friend who had been present at the Rowdy Buck

that evening. This explanation was illogical since "the whole point of [Appellant]'s reentry into the bar was to find Ms. Fulton for a ride home[.]" TCO at 14. Appellant claimed that he instructed Fulton where to pick him up, but she denied this. *Id.* at 15. The trial court opined that Appellant's separation from his only ride home was illogical, and concluded that Appellant took this opportunity to discard the firearm.

In sum, the trial court's factual findings, as supported by the record, warrant the rational inference that Appellant did not subjectively fear Smith when he deliberately reentered the Rowdy Buck instead of choosing any number of viable alternatives that would have avoided close contact with the man he thought would kill him. Even accepting that this was simply remarkably poor judgment, Appellant's version of what happened between he and Smith once back inside the bar was not credible. Finally, his actions after the shooting are not the acts of a person who was pressed into self-defense. Taken together, we conclude that the trial court's factual findings are supported by the record, and the rational inferences drawn from them sufficiently disproved Appellant's claim that he had a subjective fear of Smith. These inferences also adequately support the trial court's conclusion that Appellant formed the specific intent to kill when he reentered the bar. As self-defense is incompatible with a specific intent to kill, the Commonwealth disproved a fully justified killing, as well as imperfect self-defense. We therefore affirm.

Judgment of sentence affirmed.

Judge Bowes joins this memorandum.

Judge Sullivan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2023