**[J-70-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 795 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | February 22, 2022 in the Court of |
| | : | Common Pleas, York County, |
| v. | : | Criminal Division at No. CP-67-CR- |
| | : | 0005365-1997. |
| | : | |
| KEVIN BRIAN DOWLING, | : | SUBMITTED: August 30, 2022 |
| | : | |
| Appellee | : | |

**OPINION**

**JUSTICE WECHT**                                    **DECIDED: May 31, 2024**

The Commonwealth appeals an order granting Kevin Dowling collateral relief under the Post Conviction Relief Act.[1]  We conclude that the PCRA court erred in awarding Dowling a new trial.  Thus, we reverse.

**I.**

In August 1995, Jennifer Myers was robbed, tied up, and sexually assaulted at the art gallery that she owned in Spring Grove, Pennsylvania.  Myers did not know the man who attacked her, although she recalled that he was wearing sunglasses.  Days after the robbery, Myers spotted Dowling working at a Sheetz convenience store not far from her art gallery.  She recognized him as her assailant.

---

[1]     42 Pa.C.S. §§ 9541-46.

Myers contacted the police, who went to the convenience store to speak with Dowling. At Sheetz, police officers searched Dowling's vehicle and discovered a loaded gun, a rope, and a newspaper article reporting on the robbery at Myers' art gallery. Officers also found a pair of sunglasses resembling the ones that Myers said her attacker had been wearing.

Dowling was charged with robbery, indecent assault, and attempted rape and was released on bail. Two days before Dowling's scheduled trial on those charges—a trial at which Myers was expected to testify against Dowling—Myers was found dead in her art gallery. She was shot three times: once in her chest, once in her shoulder, and once in her eye. Witnesses outside of the gallery at the time of the murder stated that they heard three loud bangs in rapid succession at approximately 1:00 p.m.

Detectives immediately focused their investigation on Dowling, who claimed that he was fishing at the time of the murder at Muddy Run Lake, which is approximately a one-hour drive from Myers' art gallery. Dowling produced a home video showing himself at the lake around 1:00 p.m. Upon further investigation, however, detectives discovered that Dowling had tampered with the timestamp on the video in an apparent attempt to fabricate an alibi. After interviewing the boat-rental operator at Muddy Run Lake, the police learned that Dowling had rented a boat around 10:20 a.m. and then spent 30-45 minutes on the lake, leaving him more than enough time to drive to Myers' art gallery and commit the murder by 1:00 p.m.

Police also discovered a letter that Dowling had written to Myers, in which he asked for her forgiveness and stated explicitly: "I am the person who robbed and attacked you."[2]

Shortly after the murder, a woman named Sandra Eller saw Dowling's picture in media reports. Eller contacted the police, stating that she had seen Dowling on the

---

[2]     N.T. Trial, 11/5/1998, at 102.

morning of the murder at the Spring Grove Shopping Center, which is located near Myers' art gallery. Eller told the police that, on the morning in question, Dowling almost struck her with his vehicle as she was returning her shopping cart in the parking lot of Kennie's Market. Eller stated that she was unsure of the exact time this occurred, but she initially estimated to the police that it was between 12:00 and 12:30 p.m.

Police arrested Dowling and charged him with homicide. The Commonwealth subsequently informed Dowling that it intended to seek the death penalty against him. At Dowling's capital murder trial, the Commonwealth argued that he killed Myers to prevent her from testifying against him at his attempted rape and robbery trial.[3] The Commonwealth showed the jury the video of Dowling's fabricated alibi and the letter in which he confessed to attacking Myers. The Commonwealth also presented an expert who testified that the shirt, pants, hat, and shoes that Dowling was wearing on the day of the murder all tested positive for the presence of gunshot residue.

The Commonwealth called several witnesses who testified that they saw a man wearing a black wig in the area of the art gallery around the time of the murder. The Commonwealth also called Joseph Leuw—one of Dowling's fellow inmates—to testify that Dowling told Leuw that he had been in the area of the art gallery on the day of the murder, that he admitted to owning a .357 caliber weapon like the one used to kill Myers, and that he had a wig in his car that belonged to his daughter around the time of the murder. Dowling's thirteen-year-old daughter also testified for the Commonwealth, telling the jury that Dowling had said prior to the murder that "the case is just too much for him to handle; that, you know, it can't go on any longer and that [Myers] was going to die for

---

[3] After Myers' murder, Dowling's robbery and attempted rape trial was delayed several times. By the time Dowling's capital murder trial commenced, however, he had already been convicted of those crimes and was sentenced to nine to eighteen years' imprisonment in connection with the initial art gallery break-in and sexual assault.

it."[4]  Dowling's daughter also testified that Dowling showed her the manipulated video of him fishing and said "if anything happens that he'll have an excuse for the police."[5]

Eller testified for the Commonwealth and stated that she had "no doubt" that she saw Dowling in the Kennie's Market parking lot shortly before the murder, thus placing Dowling in the general area of the crime.[6]  But Eller's receipt from her purchase at Kennie's Market showed that she completed her transaction at 10:50 a.m., suggesting that the man who almost hit her in the parking could not have been Dowling, since the Commonwealth's own timeline placed Dowling an hour away at Muddy Run Lake until around 11:00 a.m.

To explain away this timeline discrepancy, the Commonwealth sought to establish that the time printed on Eller's receipt was wrong and that the transaction actually occurred sometime later.  Eller testified that, after spotting Dowling in the Kennie's Market parking lot, she drove home, unloaded her groceries, and baked some brownies before returning to the Spring Grove Shopping Center to make a purchase at Rite Aid.  Eller stated that she made her Rite Aid purchase around 1:00 p.m., that the brownies took forty minutes to bake, and that her home is a three- or four-minute drive away from the Spring Grove Shopping Center.  If accepted, this would suggest that the time on Eller's receipt was wrong, and that the Kennie's Market transaction occurred closer to 12:00 p.m., which is essentially the earliest that Dowling could have been in Spring Grove.

To further bolster this theory, the Commonwealth called as a witness Pennsylvania State Police Trooper William Mowrey.  Trooper Mowrey testified that he went to Kennie's Market five days after Myers' murder and found that the internal clock on the register that

---

[4]     N.T. Trial, 10/26/1998, at 70.

[5]     *Id.* at 73.

[6]     N.T. Trial, 10/29/1998, at 37, 40-41.

Eller used to complete her transaction (register six) was twenty minutes slow. Trooper Mowrey also testified that he checked the other registers at Kennie's Market and found that the clocks were all inaccurate to varying degrees, and that none of them was consistent with any other. Trooper Mowrey said that he returned to Kennie's Market about a month before Dowling's trial and observed that register six was eleven minutes behind the actual time.

Dowling's trial counsel, Gerald Lord, Esquire, sought to discredit Eller's timeline on cross examination and to establish that the near miss she claims to have had in the parking lot occurred when Dowling could not have been in Spring Grove. Among other tactics, Attorney Lord had Eller read out loud a transcript of her preliminary hearing testimony, in which she stated that she left Kennie's Market around 11:20 or 11:30 a.m.[7] To further pin the prosecution to this impossible timeline, trial counsel moved Eller's receipt into evidence. The receipt had a printed checkout time of 10:50 a.m. and a handwritten notation (presumably from Trooper Mowrey) stating "Register Off - 20 min."[8] In his closing argument, trial counsel emphasized to the jury that, even if register six was off by twenty minutes—as Trooper Mowrey stated that it was five days after the murder— that still puts Dowling at the Spring Grove Shopping Center around 11:00 a.m., which would be impossible if Dowling left Muddy Run Lake between 10:50 and 11:05 a.m.[9]

---

[7]     To make matters worse for the Commonwealth, Eller testified that she believed she also saw Dowling sitting in his parked car when she entered the grocery store, which makes her timeline even less plausible.

[8]     N.T. Trial, 11/4/1998, exh. 6

[9]     N.T. Trial, 11/5/1998, at 315 ("[T]he man that almost hit [Eller] in Kennie's parking lot did so between 11:20 and 11:30 in the morning. That's extremely important because if you recall, my client is out on a boat at almost 10 of 11:00"); *id.* at 316 ("[A]ccording to Trooper Mowery [*sic*] it's going to take, driving the speed limit, an hour and nine minutes or an hour and three minutes. Well, ladies and gentlemen, even if he's driving fast, he's not getting out of Hess's until 11:00 or so, and there's no way he's going to get down to Spring Grove by 11:20").

Using the Commonwealth's own evidence, trial counsel sought to raise serious doubts concerning Eller's credibility, as follows:

> [F]ive days following [Myers'] death, the register that was used by [Eller] was only off by 20 minutes according to that inner clock in there. There's no evidence to indicate that it would have been off more or less than that on [the day of the murder.]
>
> I believe Trooper Mowery [*sic*] testified a year later it was off by eleven minutes or something, but there's nothing to indicate at all in this case that that clock was off by an hour or more the day that [Eller] was there.
>
> So I would submit to you that given [Eller's] previous sworn testimony on more than one occasion that she was almost hit by this person at Kennie's between 11:20 and 11:30 is corroborated by the receipt that states 10:45 or 10:50, which if you add 20 minutes on, is very close to 11:20; it's 11:10.[10]

The Commonwealth relied upon Eller's rough timeline and Trooper Mowrey's testimony that the clock on register six was incorrect to suggest to the jury that Eller's transaction happened around 12:00 p.m. and that the man who almost hit Eller in the parking lot was indeed Dowling:

> If we confirm she's at the Rite Aid at 1:00, it's 40 minutes she spends, give another 10 minutes to benefit the Defendant, another 10 minutes to and from, we have an hour. At 12:00, she is, as she initially said the first time she spoke to the police, in the parking lot. She almost gets hit. That is just the time that Mr. Dowling is arriving at Spring [Grove.]
>
> * * * *
>
> [Y]ou've also heard testimony from Trooper Mowrey that that printout, the time on that clock on that register and every single register in Kennie's is wrong. None of them are consistent with each other, and none of them were right with the actual time. They are wrong.
>
> There is nothing correct about those register receipts.[11]

---

[10]     *Id.* at 317-18.

[11]     N.T. Trial, 11/5/1998, at 326-27.

Dowling took the stand and testified in his own defense. He admitted that he initially lied to the police about his whereabouts on the morning of the murder. Despite fabricating his first alibi, Dowling offered a second one at trial: he stated that he was at a gentlemen's club when the murder occurred, though he offered no corroborating evidence of this. Dowling also admitted on cross-examination that—regardless of whether he was the man who Eller saw at Kennie's Market earlier in the day—he theoretically could have made it to the art gallery in time to kill Myers, since he left the lake almost two hours before the murder.[12]

Ultimately, the jury convicted Dowling of first-degree murder. In the penalty phase, the jury recommended a sentence of death, finding no mitigating factors and one aggravating factor, namely that Dowling killed Myers because she was scheduled to testify against him at his upcoming robbery and attempted rape trial.[13] On direct appeal, this Court unanimously affirmed Dowling's death sentence. Addressing the sufficiency of the evidence supporting Dowling's first-degree murder conviction, we explained that:

> [a]t trial, the Commonwealth argued that [Dowling's] motive for killing [Myers] was to prevent her from testifying at the trial for his attempted rape and robbery charges. In addition to presenting [Dowling's] letter to [Myers,] the videotape of the fabricated alibi[,] and [Eller's] testimony placing [Dowling] near the art gallery at the approximate time of the murder, the Commonwealth presented several other witnesses who testified that they saw a strange man wearing a black wig in the area of the art gallery at the time of the murder. Furthermore, Joseph Leuw, a fellow inmate with [Dowling,] testified that [Dowling] told him that he had been in the area of the art gallery on the day of the murder and that he had a wig in his car that belonged to his daughter. The Commonwealth also presented a gunshot residue expert as a witness, who testified that the flannel shirt, pants, hat[,]

---

[12] N.T. Trial, 11/5/1998, at 167 ("Q: You could have been at the Spring Grove gallery of Jennifer Myers in time to kill her, couldn't you have? A: Theoretically.").

[13] *See* 42 Pa.C.S. § 9711(d)(5) ("The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.").

and sneakers that [Dowling] was wearing on the day of the murder all tested positive for gunshot residue. Given this record, we agree with the trial court that there was sufficient evidence to support the jury's conclusion that [Dowling] intentionally killed Jennifer Myers.[14]

## II.

In January 2007, Dowling filed a timely *pro se* PCRA petition and then subsequently filed an amended, counseled petition raising twenty-six claims for relief. In claim fifteen of his amended petition, Dowling alleged that the Commonwealth was in possession of, but failed to disclose to the defense, cash register journals (or "rolls" as they are sometimes called) from Kennie's Market.[15] According to the petition, an expert reviewing those register rolls would have been able to determine that the 10:50 a.m. checkout time on Eller's receipt actually was correct, meaning that Eller must have been mistaken about seeing Dowling in the parking lot as she was leaving the market.[16] Not only that, claimed the petition, the journals show that the register clocks were also correct five days after the murder, even though Trooper Mowrey testified under oath that they were all wrong when he checked them on that day.

Claim fifteen of Dowling's PCRA petition is perhaps better described as three separate claims, all of which concern the allegedly suppressed cash register rolls. First, Dowling alleged that Attorney Lord was ineffective given that he failed to: (1) investigate

---

[14]    *Commonwealth v. Dowling*, 883 A.2d 570, 574 (Pa. 2005) (footnote omitted).

[15]    Though the Commonwealth did not turn over the journals to the defense before trial, a police report given to the defense in discovery stated that the register rolls had been collected and placed into evidence.

[16]    Each of the registers at Kennie's Market had two independent sources of time, one from the internal register clock and one on the remote server that processes the store's credit/debit card transactions. By reviewing the register rolls, one could compare the times associated with the credit and debit card transactions with the times from the internal register clocks. Dowling's post-conviction experts did just that and established that the Kennie's Market register clocks were accurate on the day of the murder, including register number six.

whether the time printed on Eller's receipt was correct; and (2) retain a point-of-sale expert who would have confirmed that Eller completed her purchase at 10:50 a.m., not twenty minutes later as Trooper Mowrey suggested. Second, Dowling alleged that the Commonwealth's failure to turn over the register rolls to the defense violated *Brady v. Maryland*, 373 U.S. 83 (1963). Finally, Dowling alleged that the Commonwealth violated the United States Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264 (1959), by eliciting knowingly false testimony from Trooper Mowrey about the register clocks being incorrect.[17]

After initially disputing the facts underlying Dowling's claim, the Commonwealth retained its own experts who eventually agreed with Dowling's experts that the Kennie's Market register clocks were accurate on the day of the murder. The Commonwealth's experts therefore opined that: (1) "Eller's statement is contradicted by Kennie's Market register journal data;" (2) "there is no evidence to support Trooper Mowrey's representation that when he checked the time on register 6 at Kennie's Market on October 25, 1997, the register was discovered to be 20 minutes slow;" and (3) "there is no evidence to support Trooper Mowrey's representation that when he checked the other register times [five days after the murder], each register displayed a different time."[18]

In October 2021, the PCRA court held an evidentiary hearing on claim fifteen of Dowling's petition. Because the Commonwealth's experts agreed with Dowling's assessment of the register journals, Attorney Lord was the only witness called to testify at the hearing. Attorney Lord testified that there was no evidence before trial that the cash register Eller used on the morning of the murder was thirty minutes slow, forty-five

---

[17]     *See Napue*, 360 U.S. at 269 (holding that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment").

[18]     Joint Stipulation of Expert Testimony, 8/11/2021, at exh. B.

minutes slow, or an hour slow. Thus, Attorney Lord's trial strategy was to elicit from Eller "that she left the shopping center at approximately 11:20 to 11:30 a.m.," just as she had testified at Dowling's preliminary hearing.[19]

Attorney Lord's strategy was supported by Trooper Mowrey's testimony that register six was twenty minutes slow when he checked it after the murder, meaning that the 10:50 a.m. checkout time printed on Eller's receipt was really 11:10 a.m.—a time at which Dowling still could not have been in Spring Grove.[20] In other words, Attorney Lord did not attack the Commonwealth's theory that the clock on register six was off by twenty minutes because that timeline actually helped the defense.[21] Attorney Lord also sought to emphasize to the jury that Eller believed that she saw Dowling when she entered Kennie's Market as well, making the math on the Commonwealth's already impossible timeline even more problematic.[22]

In February 2022, the PCRA court issued an order and opinion granting Dowling a new trial in connection with claim fifteen. Beginning with Dowling's ineffectiveness claim, the court held that Attorney Lord failed to fully investigate the case, that he should have requested the cash register rolls from the Commonwealth, and that he should have retained a point-of-sale expert to dispute Trooper Mowrey's testimony that register six was off by twenty minutes five days after the murder.

---

[19]     N.T. PCRA Hearing, 10/18/2021, at 45.

[20]     *Id.* at 46.

[21]     *Id.* at 77 (Attorney Lord stating that he was "comfortable with the fact that the register receipt said what it said, and the observations of the officers was that the times were off 20 minutes as to the register that [Eller] checked through"). The PCRA court asked Attorney Lord whether it would have been better for Dowling if Eller's purchase occurred at 10:50 a.m. rather than 11:10 a.m., to which Attorney Lord responded "I guess you could put it that way. Although my position was that, either way, it was impossible. It was impossible." *Id.* at 81.

[22]     *Id.* at 46.

To establish ineffective assistance of counsel, a petitioner must demonstrate that: (1) his or her underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or inactions; and (3) he or she suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error.[23]  It is also well-established that trial counsel has a duty to conduct reasonable investigations.[24]  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[25]

Beginning with the first prong of the ineffectiveness test, the PCRA court held that Dowling's claim has arguable merit because his:

> conviction relied upon Eller's mistaken eyewitness identification and Trooper Mowrey's false testimony bolstering that identification at trial.  In fact, the Pennsylvania Supreme Court, in its previous review of this matter on initial appeal, cited Eller's testimony in support of its affirmance. *Commonwealth v. Dowling*, 883 A.2d 570, 573-74 (Pa. 2005) ("Sandra Eller positively identified [Dowling] as the person who almost struck her with his car as he was leaving the shopping center in which Ms. Myers' art gallery was located.").  No other witness identified [Dowling] and there was no scientific evidence which connected him to the crime.  And, the Commonwealth now concedes that the man Eller saw in the Kennie's Market parking lot on the day of Jennifer Myers' murder could not have been [Dowling.][26]

Turning to the reasonable basis prong, the PCRA court emphasized that "the duty to thoroughly investigate and reasonably prepare is fundamental to counsel's role as an

---

[23]   *Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987); *accord Strickland v. Washington*, 466 U.S. 668, 691 (1984).

[24]   *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

[25]   *Id.* at 521-22 (quoting *Strickland*, 466 U.S. at 691).

[26]   PCRA Court Opinion, 2/22/2022, at 18.

advocate."[27]  To determine whether counsel's investigation was reasonable, courts must "assess not only the evidence known to counsel, but [also] whether a reasonable attorney would investigate further in light of that known evidence."[28]

Here, the PCRA court opined that Attorney Lord had no strategic reason for failing to request the register rolls, investigate the accuracy of the Kennie's Market journals, or challenge Trooper Mowrey's false testimony.  The court also noted that "[t]rial counsel offered no strategic reason for failing to obtain an expert other than to state that he was not 'familiar with any defense attorney or the Commonwealth hiring point-of-sale experts.'"[29]  The court underscored that, "[i]n addition to never hiring an expert," Attorney Lord "never even requested the actual register rolls to review himself."[30]  The PCRA court called counsel's inaction in this regard "patently unreasonable."[31]

The PCRA court also discussed a memo that Attorney Lord wrote to his investigator, Bill Donivan, just days before Dowling's trial.  In the memo, Attorney Lord asked Donivan to go to Kennie's Market to investigate the register clocks.  The memo directs Donivan to:

> 1) Go to Kennies and buy something through register #6 then keep the receipt—check the receipt against your watch to see how far the time is off
>
> 2) While at Kennies, meet with the manager, or person in charge.  Find out all you can about the clock in the register- how often it is reset, when was it last reset, how long it has been off by approx. 20 minutes; does the time fluctuate between resettings

---

[27]    *Id.* (citing *Andrus v. Texas*, 590 U.S. ___, 140 S. Ct. 1875, 1881 (2020)).

[28]    *Id.* at 18-19 (citing *Wiggins*, 539 U.S. at 527).

[29]    *Id.* at 23-24 (quoting N.T. PCRA Hearing, 10/18/2021, at 49).

[30]    *Id.* at 26.

[31]    *Id.*

3) Get the manager to refer you to an expert at the register co. to get more information about the clock inside the register.  Contact this person and verify resetting times, etc.

*This item is very important.  If we can establish the clock was definitely off by 20 minutes on 10/20/97, it will establish Dowling could not have been the guy S. Eller saw at Kennies the morning of 10/20/97.[32]

Discussing this memo, the PCRA court emphasized that Attorney Lord wanted "to establish at trial that the Kennie's Market register was 'off,'" yet he "never conducted this investigation," "never secured an expert," and "never requested or reviewed the register receipt rolls himself."[33]  The court concluded that, "[h]ad trial counsel conducted an investigation into the accuracy of Eller's Kennie's Market receipt—or even simply requested and reviewed any of the receipts before or after Eller's transaction—especially knowing time was a critical issue in this case—he would have been prepared to challenge Trooper Mowrey's baseless opinion testimony and provide accurate information to the jury as to Eller's supposed eyewitness sighting."[34]

In the final paragraph of its ineffectiveness analysis, the PCRA court held that Dowling was prejudiced by Attorney Lord's failure to review the register rolls and/or retain an expert.  According to the PCRA court, had Attorney Lord done those things:

it is clear there is a reasonable probability that the outcome of the trial would have been different; [Dowling] was prejudiced.  It is reasonably probable that had trial counsel conducted any pretrial investigation or prevented false testimony from being presented to the jury at trial—at least one juror would have found a reasonable doubt regarding [Dowling's] guilt or innocence.[35]

---

[32]     *Id.* at 23 (N.T. PCRA Hearing, 10/18/2021, at 72-73, exh. 1).

[33]     *Id.*

[34]     *Id.* at 21.

[35]     *Id.* at 26.

Turning to Dowling's *Brady* and *Napue* claims, the PCRA court held that the Commonwealth violated Dowling's due process rights under *Brady* by not disclosing the cash register rolls from Kennie's Market. A *Brady* violation occurs when: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the prosecution, even if inadvertently; and (3) the evidence is material.[36] Beginning with the first prong of that test, the PCRA court concluded that the suppressed register rolls were exculpatory because "[d]isclosure of the rolls by the Commonwealth would have clearly revealed that Eller's 'eyewitness sighting' of [Dowling] could not have taken place and Eller would have been impeached as a witness."[37] The PCRA court also found that the Commonwealth suppressed the register rolls, noting that the prosecution was in possession of the rolls, yet did not turn them over to the defense.

The court then discussed *Napue*, explaining that a "conviction obtained through the knowing use of materially false evidence and testimony may not stand" and that a "prosecuting attorney has an affirmative duty to correct the testimony of a witness which he knows to be false."[38] The PCRA court stated that, here, the Commonwealth and the defense agreed that Trooper Mowrey's testimony was not factual. Trooper Mowrey testified that register six was off by twenty minutes when he checked it five days after the murder. He also testified that all of the registers at Kennie's Market were wrong when he checked them and that they were all inconsistent with each other. But the Commonwealth's own expert agreed that: (1) "the Kennie's Market registers were accurate on the day of the murder;" (2) "the internal clocks on each register were controlled by one master terminal so they each always displayed the same time as one

---

[36]     *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

[37]     PCRA Court Opinion, 2/22/2022, at 27.

[38]     *Id.* at 28 (citing *Commonwealth v. Hallowell*, 383 A.2d 909, 911 (Pa. 1978)).

another;" and (3) "Trooper Mowrey would not have seen different times on each register upon inspection at Kennie's Market on October 25, 1997."[39]

The PCRA court then turned to materiality, discussing both the *Brady* and *Napue* issues in a single analysis. The court explained that, under *Brady*, the Commonwealth's failure to disclose exculpatory information is material if "there is a reasonable probability the outcome would have been different if the prosecution had disclosed the evidence,"[40] whereas "[f]alse testimony is material and necessitates a new trial" under *Napue* if it could "in any reasonable likelihood have affected the judgment of the jury."[41] Here, the PCRA court concluded that there is a reasonable probability that the outcome of Dowling's trial would have been different had the Commonwealth disclosed the register rolls. The court opined that:

> [Dowling's] conviction was the result of the jury's acceptance of Eller's mistaken identification, bolstered by Trooper Mowrey's false testimony. Had the register receipt rolls been disclosed by the Commonwealth and effectively presented by trial counsel, it would have been apparent to the jury that Eller's transaction at Kennie's Market and her observations upon departing the store occurred within minutes of 10:50 a.m., not noon. Thus, her identification of [Dowling] as the person she saw near the crime scene before [Myers] was murdered, had to be mistaken. And, it would have been apparent to the jury that the testimony of Trooper Mowrey that the registers at Kennie's Market were "off," was entirely incorrect and false.[42]

The PCRA court therefore concluded that Dowling "is entitled to a new trial as a result of trial counsel's ineffective assistance and failure to investigate . . . and for the

---

[39] *Id.* at 29 (footnoted omitted).

[40] *Id.* at 30 (citing *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

[41] *Id.* (citing *Commonwealth v. Wallace*, 455 A.2d 1187, 1190-91 (Pa. 1983)).

[42] *Id.* at 30-31.

Commonwealth's failure to comply with its obligations under *Brady*."[43] The court stated that Dowling "is also entitled to relief under the more relaxed *Napue* standard as the Commonwealth knew, or should have known, that Eller and Trooper Mowrey's testimony regarding the accuracy of the Kennie's Market register receipts was false and there was a reasonable likelihood that the false testimony could have affected the judgment of the jury."[44]

### III.

The Commonwealth appealed the PCRA court's ruling,[45] arguing that the court erred in granting relief under all three theories that Dowling raised in claim fifteen. Beginning with Dowling's ineffectiveness claim, the Commonwealth contends that Attorney Lord was not ineffective for failing to request the register rolls from the Commonwealth or for failing to retain a point-of-sale expert to prove that the time on Eller's receipt was correct. The Commonwealth emphasizes that, prior to trial, the prosecution's own evidence showed that Eller could not have seen Dowling in the Kennie's Market parking lot because, even if the time on Eller's receipt was off by twenty minutes as Trooper Mowrey suggested, Dowling was still at least forty minutes away when Eller allegedly spotted him. In other words, Attorney Lord believed that, if the register "clock was definitely off by 20 minutes, it would establish Dowling could not have been the guy" who Eller said she saw in the parking lot.[46] Thus, the Commonwealth

---

[43] *Id.* at 31.

[44] *Id.*

[45] *See* 42 Pa.C.S. § 9711(h)(1) (stating that "[a] sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania").

[46] N.T. PCRA Hearing, 10/18/2021, at 82.

argues, Attorney Lord reasonably chose to accept (rather than attack) the Commonwealth's timeline so that he could use it to discredit Eller.[47]

The Commonwealth also contends that there is no reasonable probability that the jury's verdict would have been different had Attorney Lord successfully demonstrated to the jury that the 10:50 a.m. checkout time on Eller's receipt was correct. The Commonwealth underscores that: (1) Attorney Lord successfully discredited Eller at trial using Trooper Mowrey's own testimony; (2) Eller was not critical to the case; and (3) the Commonwealth presented ample independent evidence incriminating Dowling. The Commonwealth calls the PCRA court's short prejudice analysis "legally insufficient," "inadequate," and "erroneous."[48] Contrary to the PCRA court's conclusion, the Commonwealth suggests that "[e]vidence from the cash register rolls would have merely confirmed what Attorney Lord established at trial—Eller could not have seen Dowling between 11:20 AM and 11:30 AM."[49]

The Commonwealth raises similar issues with the PCRA court's materiality analysis under *Brady* and *Napue*, arguing that "Dowling cannot meet the materiality prong of the *Brady* analysis because he did not meet the substantively identical prejudice test

---

[47]     Brief for Commonwealth at 27 ("Attorney Lord established through the testimony of Eller and Mowery [*sic*], as well as Eller's receipt that Eller could not have observed Dowling between 11:20 AM and 11:30 AM."); *see Strickland*, 466 U.S. at 681 (1984) ("[W]hen counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial.").

[48]     *Id.* at 31-32; *see* PCRA Court Opinion, 2/22/2022, at 26 ("Had [Attorney Lord] done any of these things, it is clear there is a reasonable probability that the outcome of the trial would have been different; [Dowling] was prejudiced. It is reasonably probable that had trial counsel conducted any pretrial investigation or prevented false testimony from being presented to the jury at trial—at least one juror would have found a reasonable doubt regarding [Dowling's] guilt or innocence.").

[49]     Brief for Commonwealth at 35.

under the ineffectiveness test."[50] The Commonwealth argues that the court's materiality analysis, like its prejudice analysis under *Strickland*, "failed to evaluate any of the evidence that Attorney Lord elicited that discredited Eller" and "failed to evaluate any of the myriad, independent evidence that incriminated Dowling."[51]

Given the deficiencies in the PCRA court's prejudice and materiality analyses identified by the Commonwealth, this Court remanded the matter for preparation of a supplemental Pa.R.A.P. 1925(a) opinion addressing those issues.[52] On remand, the case was reassigned to Judge Harry M. Ness because the initial PCRA jurist, Judge Robert J. Eby, retired shortly after granting Dowling a new trial. Beginning with Dowling's ineffectiveness claim, Judge Ness concluded in his supplemental opinion that it is not reasonably probable that the result of the Dowling's trial would have been different absent counsel's alleged deficiencies. In reaching this conclusion, which is contrary to the initial PCRA court opinion's analysis, the supplemental opinion underscored that "trial counsel did, in fact, cross-examine Trooper Mowrey with respect to the plausibility of [Eller's] account," and that he argued persuasively to the jury that, "regardless of whether [Eller's] receipt was accurate or the register was twenty minutes slow, [Dowling] could not have been seen by [Eller] at the time she claimed."[53]

The supplemental opinion also emphasized "the variety of other evidence presented" at Dowling's trial that had nothing to do with Eller or the Kennie's Market

---

[50] *Id.* at 49.

[51] *Id.* at 54.

[52] *Per Curiam* Order, 3/21/2023, at 1-2 (directing the PCRA Court to address: (1) whether "Dowling suffered prejudice under *Strickland*;" (2) whether Trooper Mowrey's false testimony could "in any reasonable likelihood have affected the judgment of the jury;" and (3) whether the allegedly suppressed register rolls were material under *Brady*).

[53] Supplemental PCRA Court Opinion, 3/21/2023, at 4.

timeline.[54]  Among other things, Judge Ness noted that Dowling's "falsified alibi video" demonstrated "significant consciousness of guilt."[55]  The handwritten apology letter in which Dowling admitted that he robbed and assaulted Myers—combined with the fact that the murder "occurred so close in time to the ongoing proceedings" for those offenses— also significantly incriminated Dowling.[56]  On top of that, the Commonwealth demonstrated at trial that the clothing Dowling was wearing on the day of the murder tested positive for gunshot residue and that Dowling owned "an unregistered gun capable of firing the type of bullet used in the killing."[57]

Given this "substantial"[58] evidence incriminating Dowling in Myers' killing, Judge Ness also concluded that it is unlikely that Trooper Mowrey's false testimony "would have affected the judgment of the jury."[59]  The court ruled similarly regarding whether there is a reasonable probability that the outcome of Dowling's trial would have been different absent the Commonwealth's alleged failure to disclose the cash-register journals.  Again, the court cited "the abundance of other strong evidence" and concluded that, "even if a [*Brady*] violation occurred, in light of the totality of the circumstance[s] of trial, such alleged violation does not undermine confidence in the verdict reached by the jury."[60]

---

[54]    *Id.*

[55]    *Id.* at 1.

[56]    *Id.* at 2.

[57]    *Id.*

[58]    *Id.* at 5.

[59]    Id.

[60]    *Id.* at 6.  Following the PCRA court's issuance of its supplemental opinion, we allowed both parties to file additional briefs addressing the PCRA court's new analysis. In addition to filing a supplemental brief, Dowling also sought leave to file a supplemental reply brief, which we now grant.

**IV.**

We agree with the Commonwealth and with the supplemental PCRA court opinion that the court initially erred in granting Dowling a new trial. We begin with Dowling's ineffectiveness claim. The law in this area is well-settled. A PCRA petitioner alleging ineffective assistance of counsel must demonstrate: (1) that his or her underlying claim has arguable merit; (2) that counsel had no reasonable basis for his or her course of conduct; and (3) that there is a reasonable probability that, but for counsel's act or omission, the outcome of the proceeding would have been different.[61] In all cases, counsel is presumed to be effective and the PCRA petitioner has the burden of proving otherwise.[62] Furthermore, because trial counsel has a duty to conduct only reasonable investigations, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[63]

Here, we need not address whether trial counsel had a reasonable basis for not requesting the register rolls and/or retaining a point-of-sale expert to disprove the timeline suggested by Eller and Trooper Mowrey.[64] In our view, even if one assumes that trial counsel's chosen course was unreasonable, Dowling still failed to establish a reasonable probability that the outcome of his trial would have been different absent counsel's alleged failures. Setting aside what did or did not happen in the Kennie's Market parking lot, there was abundant direct and circumstantial evidence—completely independent of Eller and Trooper Mowrey—that implicated Dowling in Myers' murder.

---

[61] *Commonwealth v. Jones*, 683 A.2d 1181, 1188 (Pa. 1996).

[62] *Commonwealth v. Marshall*, 633 A.2d 1100, 1104 (Pa. 1993).

[63] *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 691).

[64] *Commonwealth v. Daniels*, 963 A.2d 409, 419 (Pa. 2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.").

Specifically, the evidence presented at trial showed that Dowling robbed and attempted to rape Myers at her art gallery, crimes to which he confessed in writing. After being charged for the violent robbery, Dowling told his daughter that "the case is just too much for him to handle," that "[Myers] was going to die for it," and that he had prepared a doctored fishing video that would serve as "an excuse for the police."[65] Myers was subsequently murdered on the eve of Dowling's trial, at the exact same location where he robbed and assaulted her. All of the clothing that Dowling was wearing on the day of the murder tested positive for gunshot residue, and, when the police questioned Dowling about the murder, he lied to them and showed them the falsified home video.[66]

Then at trial, Dowling's story changed. He admitted that he lied to the police and that he really had left the lake approximately two hours before the murder. Dowling admitted on the witness stand that, mathematically speaking, he theoretically could have made it to Myers' Spring Grove art gallery (with which he was obviously familiar) in time to commit the 1:00 p.m. murder.[67] Dowling nevertheless offered a second alibi at trial, stating that he was at a gentlemen's club at the time of the murder, an assertion that he could produce no evidence to support.

Furthermore, it is difficult to conclude that retaining an expert to challenge Eller's suggestion that her transaction occurred around 12:00 p.m. would have altered the outcome of Dowling's trial considering that Eller's timeline was inconsistent with her initial

---

[65] N.T. Trial, 10/26/1998, at 70, 73.

[66] This Court has explained that such fabrications can evince consciousness of wrongdoing "and hence are indicatory of guilt." *Commonwealth v. Carbone*, 574 A.2d 584, 589 (Pa. 1990) ("The fabrication of false and contradictory statements by an accused are evidence from which a jury may infer that they were made with 'an intent to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt.'" (quoting *Commonwealth v. Gockley*, 192 A.2d 693, 701 (Pa. 1963))).

[67] N.T. Trial, 11/5/1998, at 167 ("Q: You could have been at the Spring Grove gallery of Jennifer Myers in time to kill her, couldn't you have? A: Theoretically.").

statements to the police, with her preliminary hearing testimony, with her printed receipt from the market, and with Trooper Mowrey's testimony that the register clocks were only off by twenty minutes. While the PCRA court's initial opinion suggested that Dowling's conviction "was the result of the jury's acceptance of Eller's mistaken identification, bolstered by Trooper Mowrey's false testimony,"[68] the opinion did not account for the fact that Trooper Mowrey's testimony actually *undermined* Eller's claim that her Kennie's Market transaction occurred sometime around 12:00 p.m.

Regardless of whether the jury believed Eller or Trooper Mowrey, the Commonwealth's evidence established that Dowling had the time (and the motive) to drive from Muddy Run Lake to Myers' art gallery by 1:00 p.m. to commit the murder. This remains true even if Eller's sighting of Dowling was mistaken. In other words, the Commonwealth did not need to prove that Eller saw Dowling outside of Kennie's Market in order to prove that Dowling killed Myers. Considering the Commonwealth's evidentiary presentation in toto, and bearing in mind that there was substantial alternative evidence incriminating Dowling, we agree with the supplemental opinion of the PCRA court that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[69]

These same circumstances also lead us to conclude that Dowling failed to establish materiality for purposes of his *Brady* and *Napue* claims. Considering the totality of the evidence presented at trial, Trooper Mowrey's false testimony—which, again, actually undermined Eller's testimony—could not "in any reasonable likelihood have

---

[68]    PCRA Court Opinion, 2/22/2022, at 30.

[69]    *Strickland*, 466 U.S. at 694.

affected the judgment of the jury."[70]  We also discern no reasonable probability that the outcome of Dowling's trial would have been different had the Commonwealth disclosed the Kennie's Market cash register journals to the defense.[71]  As with Dowling's ineffectiveness claim, we note that Dowling's attorney used Trooper Mowrey's false testimony to argue that Eller could not have seen Dowling in the parking lot after her shopping trip.[72]  And while it is true that the cash register rolls would have shown that the register clocks were correct on the day of the murder, Dowling could not have been the person Eller saw in the parking lot *even if the registers were off by twenty minutes*, as Trooper Mowrey testified.  We also agree with the supplemental opinion that Dowling cannot establish materiality given his obvious motive, his bogus first alibi, his dubious second alibi, his inculpatory statements to his daughter, his GSR-covered clothing, and his admission that he theoretically could have made it to Myers' art gallery in time to commit the 1:00 p.m. murder even if he was not the person who almost hit Eller in the

---

[70]     *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271).  Because we conclude that Dowling failed to establish materiality in connection with his *Napue* claim, we need not address the Commonwealth's argument that it did not knowingly elicit false testimony from Trooper Mowrey.  Brief for Commonwealth at 52-53.

[71]     *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (stating that evidence is material within the meaning of *Brady* when there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed).  As with Dowling's *Napue* claim, our conclusion that Dowling failed to establish materiality means that we need not address *Brady*'s other elements.  Nevertheless, we note that the Commonwealth disputes that it suppressed the register rolls, emphasizing that Dowling never requested the rolls despite Trooper Mowrey's police report stating that they were taken into evidence.  Mowrey's Homicide Report, R.R. at 563A (indicating that "[f]our register receipt rolls were collected and placed into evidence reference property number H7131K, including the roll containing [Eller's] purchase."); Brief for Commonwealth at 50 ("The Commonwealth, therefore, did not conceal or suppress the rolls.  It disclosed them.").

[72]     *See* Brief for Commonwealth at 34 (stating that the register rolls merely would have "help[ed] establish that Eller could not have seen Dowling outside of Kennie's," which Dowling's attorney already "established through the testimony of Eller, the testimony of Trooper Mowery [*sic*], and Eller's receipt from Kennie's").

parking lot.  Thus, we conclude that the PCRA court erred in initially granting Dowling post-conviction relief on all three theories underlying claim fifteen of his PCRA petition.[73]

In his supplemental brief, Dowling criticizes the supplemental opinion on many fronts.  First, he contends that the supplemental opinion ignored the court's earlier factfinding.  For example, the supplemental opinion ventured that the Commonwealth's stipulation that the register clocks were correct on the day of the murder merely made it "less likely," but not impossible, for Eller to have seen Dowling in the parking lot.[74]  This seemingly conflicts with the PCRA court's initial conclusion that Dowling "could not have arrived to the Kennie's Market parking lot until after 11:50 a.m., a full hour after Eller checked out of and departed Kennie's Market."[75]  Dowling protests that the supplemental opinion's conflicting conclusion was based on the "fanciful suggestion" that Eller might have taken a full hour to load her groceries into her vehicle.[76]

It does appear that the supplemental opinion strayed somewhat from the court's initial factual determinations.  Nevertheless, we emphasize that our conclusion today that Dowling's claims fail for want of prejudice and materiality assumes—as the PCRA court

---

[73]    Because we conclude that Dowling failed to establish materiality in connection with his *Brady* and *Napue* claims, we need not address whether Dowling proved the other elements of those claims.  We note, however, that the Commonwealth continues to argue that it did not suppress the register rolls for *Brady* purposes and that it did not knowingly elicit false testimony from Trooper Mowrey.  Brief for Commonwealth at 50-53.

[74]    Supplemental PCRA Court Opinion, 3/21/2023, at 4.

[75]    PCRA Court Opinion, 2/22/2022, at 11.

[76]    Supplemental Brief for Dowling at 14-15 ("Eller's receipt shows fifteen items totaling $53.52.  It can be said pretty confidently that it did not take Eller an hour to lift her modest purchases and place them in the trunk. There is no evidence whatsoever that Eller stood around for an hour before she made her supposed observations; this is pure invention[.]"); Supplemental PCRA Court Opinion, 3/21/2023, at 6 ("We have no way of knowing how long it took [Eller] to load her groceries.").

initially did—that Eller's identification of Dowling was mistaken.[77] As explained above, we reach this conclusion based on the robust evidence (independent of Eller and Mowrey) incriminating Dowling in Myers' killing *regardless of whether Dowling was spotted in the Kennie's Market parking lot on the morning of the murder.*

Next, Dowling contends that the court's supplemental opinion gave too much weight to the incriminating admissions that he supposedly made to his daughter and to fellow inmate Joseph Leuw. Dowling argues that Leuw, who was awaiting sentencing and facing a possible lengthy prison term, "had every reason to fabricate his account to curry favor with the prosecution."[78] According to Dowling, Leuw's testimony is especially suspect because "[t]his was a high publicity case" where the "facts" could have been "gleaned by anyone with access to media."[79] Dowling similarly argues that the supplemental opinion placed too much weight on his daughter's testimony, in which she stated that Dowling showed her his videotaped alibi and said that Myers "was going to die." Dowling calls his daughter "a mentally-ill child" who admitted "she had poor memory and blackouts," and says that her testimony "pales compared to a disinterested eyewitness" who claimed she was "sure" that she saw Dowling in the parking lot.[80]

The supplemental opinion did not err in weighing the testimony of Leuw and of Dowling's daughter when considering the totality of the evidence presented at trial. As for Dowling's contention that his daughter's testimony should be afforded little or no

---

[77]    PCRA Court Opinion, 2/22,2022, at 18 ("[T]he Commonwealth now concedes that the man Eller saw in the Kennie's Market parking lot on the day of Jennifer Myers' murder could not have been [Dowling]."); *id.* at 11 ("Eller's identification of [Dowling] as the man she saw when she departed Kennie's Market that morning was then mistaken and the man the parking lot that Eller saw at 10:50 a.m. was simply not [Dowling].").

[78]    Dowling's Supplemental Brief at 21.

[79]    *Id.*

[80]    *Id.*

weight because she admitted that "she had poor memory and blackouts,"[81] Dowling misstates the record. Dowling's daughter merely testified that she could not remember what she said *after* Dowling made his incriminating statement to her, which is perhaps an unsurprising reaction for a child who had just learned that her father was planning a murder to avoid being convicted of attempted rape and robbery.[82] As for Leuw's testimony, it is not all clear to what extent the supplemental opinion relied upon his account, which only indirectly implicated Dowling in the murder.[83] As Dowling admits, the supplemental opinion mentioned Leuw's testimony while recapping the factual history of the case, but did not "incorporate or rely on" the same in its analysis.[84] While we concede that there is a reasonable debate to be had concerning the reliability of jailhouse informant testimony,[85] the supplemental opinion here did not place undue weight on Leuw's account when evaluating the totality of the Commonwealth's case against Dowling. More importantly, our analysis set forth above concluding that Dowling failed to establish prejudice and materiality does not rely upon Leuw's testimony at all.

Lastly, Dowling argues that the supplemental opinion "violates the coordinate jurisdiction rule" given that the PCRA court initially concluded that Dowling established

---

[81]     *Id.*

[82]     N.T. Trial, 10/26/1998, at 70-71 (Dowling's daughter stating that she "blacked out after that" and could not remember "anything after that").

[83]     As mentioned, Leuw merely testified that Dowling told him that he had been in the area of the art gallery on the day of the murder, that he admitted to owning a .357 caliber weapon like the one used to kill Myers, and that he had a wig in his car that belonged to his daughter around the time of the murder.

[84]     Dowling's Supplemental Brief at 21.

[85]     *See Commonwealth v. Crispell*, 193 A.3d 919, 956 n.2 (Pa. 2018) (Saylor, C.J., concurring and dissenting) (discussing, and agreeing with, the jurisdictions that have found jailhouse informant testimony to be "inherently suspect").

prejudice and materiality, whereas the remand court concluded that he did not.[86] In this context, the coordinate jurisdiction rule (sometimes called the "law of the case" doctrine) provides that, "upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court."[87] In other words, the coordinate jurisdiction rule prevents a second judge of same court from *vacating* a prior judge's order. Here, the supplemental opinion did no such thing because the remand court did not purport to overturn the order granting Dowling post-conviction relief. Instead, the remand court simply performed the supplemental analysis we requested in our remand order. It is not the remand court, but rather this Court—a court of *superior* jurisdiction—that today vacates the order granting Dowling's petition for post-conviction relief.

Having concluded that the PCRA court erred in initially granting Dowling relief on all three legal theories that he raised in claim fifteen, we reverse the PCRA court's order and remand for consideration of Dowling's remaining claims.

Chief Justice Todd and Justices Donohue, Dougherty, Mundy, Brobson and McCaffery join the opinion.

Justice Donohue files a concurring opinion.

---

[86] Dowling's Supplemental Brief at 29-30.

[87] *Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995).